STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION v. STATE OF NORTH CAROLINA AND THE DEPARTMENT OF JUSTICE OF THE STATE OF NORTH CAROLINA.

STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION v. SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY.

(Filed 29 January, 1954.)

1. Telephone and Telegraph Companies § 1a—

   In return for the privileges granted a *quasi*-public utility, the State reserves the right to supervise and regulate its operations and fix or approve the rates charged by it for intrastate service.

2. Same: Constitutional Law § 8c: Utilities Commission § 1—

   The power to grant franchises to public service corporations and to fix their rates rests in the General Assembly, which power the General Assem-

bly may delegate to an administrative agency provided the General Assembly prescribes rules and standards to guide such agency in the exercise of the delegated authority. The statute delegating to the Utilities Commission this authority is constitutional in fixing adequate rules and standards. G.S. 62-66, G.S. 62-124.

**3. Telephone and Telegraph Companies § 1c—**

In determining the just and reasonable rate to be charged by a public service corporation, the Utilities Commission must ascertain the value of the utility's investment, which constitutes the rate base, and then calculate the rate which will yield the desired net return upon the basis of the utility's gross income from its operations, less operating expenses, including the amount of capital investment currently consumed in rendering the service.

**4. Same—**

In fixing the value of the property of a utility for the purpose of fixing rates, it is the duty of the Utilities Commission to arrive at its own independent conclusion as to the fair value of the property, and not accept any particular formula advanced by the parties.

**5. Same—**

It is improper for the Utilities Commission, in ascertaining the value of a utility's property for rate-making purposes, to use solely the book value, or cost less depreciation, or solely the replacement cost, since the statute requires that both of these factors as well as other factors should be considered in determining the fair value of the utility's investment for rate-making purposes. G.S. 62-124.

**6. Same—**

In determining the value of the property of a utility for rate-making purposes, the Utilities Commission must ascertain the value of the utility's property in use as a composite public utility, and not its market value as second-hand property.

**7. Same—**

In fixing intrastate rates for a telephone company operating in several states, the Utilities Commission should take into consideration the net return such utility earns on its properties in such other states to the extent of not requiring customers in North Carolina, in order to maintain the utility's financial condition, to pay a substantially higher rate than permitted in other states.

**8. Same—**

When a factor in maintaining the operations of a public utility, the Utilities Commission should consider the financial condition, of the utility to the extent the demand for its bonds and securities affect its capacity to compete for capital in the open market.

**9. Same—**

For rate-making purposes a public utility is allowed to deduct annually as an operating expense so much of its capital investment as is actually consumed during the current year in rendering the service required of it,

UTILITIES COM. *v.* STATE and UTILITIES COM. *v.* TELEGRAPH CO.

but such depreciation must be based upon actual cost and not replacement value, and must represent as near as may be the actual investment currently consumed not provided against by maintenance.

**10. Same—**

The Utilities Commission is not compelled to provide a 6% rate of return to a public utility, nor is its former allowance of a rate of return *res judicata* barring the Commission from fixing a lesser rate in a subsequent proceeding.

**11. Same: Utilities Commission § 5—**

When the Utilities Commission fixes a schedule of rates under the standard prescribed by the Legislature, such schedule is binding upon the interested parties and the courts, provided it is within the bounds of reason.

**12. Telephone and Telegraph Companies § 1c—**

Where, as a matter of custom, a public utility uses for operating capital moneys collected by it in taxes for the Federal Government which it is not required to pay to the Federal Government until a later date, the Utilities Commission should take such capital into consideration in fixing rates, which action is neither a condemnation nor condonement of the practice.

**13. Utilities Commission § 5—**

The duty to fix rates is imposed by law upon the Utilities Commission, and where its order fixing a rate is erroneous because of misconstruction of the applicable law, the cause must be remanded to the Commission for further proceedings in accordance with the opinion of the Supreme Court.

**14. Telephone and Telegraph Companies § 1c—**

In fixing the rate for a telephone company, the Utilities Commission must take into consideration the net income to be produced by the increase in the number of telephones in service at the end of any test period adopted by the Commission.

APPEAL by protestants, the State of North Carolina and the Department of Justice of North Carolina, from *Bobbitt, J.,* in Chambers at Charlotte, N. C., 24 August 1953. Modified and affirmed.

Amended application filed by Southern Bell Telephone and Telegraph Company before the Utilities Commission for an order permitting and approving an increase of its rates and charges for intrastate service rendered in this State.

On 21 July 1952 the applicant, by amended petition, applied for an order approving and permitting applicant to put into effect the schedule of rates and charges set out in its Exhibit A attached to the application. This schedule provides for a total gross increase in the rates for intrastate service rendered by the applicant in the amount of $3,426,000.

The State of North Carolina and the Department of Justice of North Carolina, through the Attorney-General, intervened and protested in behalf of the public the allowance of the proposed increase in rates.

For convenience and brevity in stating the pertinent facts and discussing questions presented for decision on this appeal, we will hereafter refer to Southern Bell Telephone and Telegraph Company as Southern Bell or the applicant, to the Utilities Commission as the Commission, to the American Telephone and Telegraph Company as A T & T, and to the State of North Carolina and the Department of Justice of said State as the protestant or appellant. As the United States Government, in respect to taxes levied and the disposition of the fund derived therefrom and the amount allowed for depreciation in accounting for taxes, is indirectly involved in the case, we will refer to it as the government.

The case came on for hearing before the Commission 28 October 1952 on the amended application filed by Southern Bell, and the hearing was concluded on 30 December 1952. On 21 April 1953 the Commission entered its preliminary order fixing a rate base and directing the applicant to file a schedule of rates in accord therewith which would produce additional gross revenue of $891,000 from its toll service and $757,056 from other classes of service, making a total additional gross annual income of $1,648,056. The applicant was directed to base such schedule on stations and operations as of 31 July 1952.

Southern Bell operates in nineteen southern States including North Carolina. In this State it operates in 67 counties throughout the State. Its properties include exchange and toll switchboards located in 70 exchanges having the capacity of 184,200 lines, approximately 1,700 miles of toll pole lines, approximately 86,200 miles of exchange and toll open wire, and approximately 1,388,200 miles of exchange and toll wire in cable, approximately 366,700 telephones, and a large quantity of land, buildings, underground conduits, furniture and office equipment, motor vehicles, and work equipment, material and supplies and other items of property necessary and useful in the rendition of telephone service. As of 31 August 1952 the original cost of petitioner's properties used and useful in rendering interstate and intrastate telephone service in North Carolina, as taken from its books and records, amounted to $101,074,814.

It is a member of the Bell System which renders both intrastate and interstate service throughout the United States. A T & T is the parent company of the Bell System, and Southern Bell is a wholly owned subsidiary.

From 1945 to April 1952 Southern Bell was granted applications for increases in its rates five separate times. The total amount heretofore allowed is $7,146,000. The last order allowing an increase was entered 28 April 1952, and this application for still another increase was filed 21 July 1952, only about three months thereafter.

During this period, appropriately referred to as the postwar period, the net return of Southern Bell in the nineteen States in which it operates

has been approximately 4.8%, while in North Carolina, according to its figures, it has been 5.40%. During this period it has increased its capital stock from 175,000,000 shares in 1945 to 615,000,000 shares as of 31 July 1952. The ratio of debt capital to equity capital has dropped from about 43% in 1947 to 22% in 1952—the lowest in twenty-five years. It has increased its surplus from $3,871,433 in 1947 to $18,622,000 on 31 July 1952, after adjustment for the 6.5% dividend paid in 1952. Surplus per share has increased from $1.55 in 1947 to $3.10 at the end of 1952, notwithstanding the large increase in capital stock. And in addition thereto, it has paid an annual dividend of 6%, except in 1952 when the dividend was 6.5%.

During the postwar period Southern Bell has collected and had on hand a monthly average of $2,723,738 in Federal tax accruals over a thirteen-month period ending 31 July 1952. This is money which Southern Bell is not required to transmit to the government for more than a year after collection. It is actually used freely by Southern Bell for all corporate purposes, particularly as working capital and for the payment of current bills for materials and supplies, and it is mixed with all other corporate funds, and costs the company nothing for its use. If no consideration is given to this amount in fixing the rate base, it would not mean that the company does not have the same amount of working capital, for it would continue to have and use any part or all of the tax accrual money it cared to. Notwithstanding these facts, the Commission declined to "condone or encourage" the use of the fund for working capital or other corporate purposes and, instead, allowed as a deductible expense a large sum for working capital and almost $900,000 for the payment of current bills for materials.

The A T & T, the parent company, maintains a money pool for the use of its subsidiaries. Southern Bell has the privilege and does borrow, from time to time, from this pool such funds as it may need for improvements, enlargements, and other purposes. When the debt thus created grows to an amount out of proportion to the capital stock of the company, Southern Bell then issues its common capital stock and delivers the same to A T & T, at par, as a credit on the debt account, notwithstanding the fact that the stock so delivered could be sold on the market at a price largely in excess of par, and then pays A T & T a dividend of 6% on both its old and its new stock over and above the interest it pays upon the money borrowed, if any. The A T & T reaps the benefit of the difference between the par and the market value of such stock, and the customers of Southern Bell must bear the burden of the loss to the applicant.

Wage contracts entered into with its employees, the increase in the cost of materials, supplies, and construction have increased since the entry of the last order. Southern Bell is a rapidly growing public utility and now

has anxiously waiting for service more than 16,000 applicants for telephones, and the number of its employees has increased from 4,815 in 1950 to 5,905 in July 1952.

During the postwar period, through the indicated procedure, Southern Bell has decreased the ratio of borrowed money investment from 43% to 22%. According to the evidence, one-third to one-half of the total invested capital could safely be obtained through borrowed money, depending upon which witness you believe. The present per cent is much below either estimate.

The frequent grants of permission to Southern Bell to increase its rates has caused the monthly charges for telephones, during this postwar period, to increase by approximately 100%—in Raleigh from $5.25 to $10.25.

The bonds and obligations of Southern Bell now enjoy on the present market and upon the basis of its present income the high rating of Aa or A 1 plus.

The record contains 523 pages. Naturally, therefore, it contains many detailed facts and circumstances which it was the duty of the Commission to take into consideration in arriving at its conclusion as to what constitutes a fair net return on the investment of the applicant for intrastate purposes. It is not necessary for us to detail these facts at this time.

The additional gross revenue Southern Bell asserts is necessary to afford a fair return on its investment apparently does not include or take into consideration the additional income which results from the fact its total number of telephones has increased from 159,951 in 1946 to 336,668. It does include an allowance of $161,572 for cash working capital and $759,079 for materials and supplies.

The Commission in its order discussed different phases of the questions presented and found facts in part as follows:

"It will be observed from the above tabulation that there is a very wide difference between AVERAGE net investment for either 7 months or 12 months ending July 31, 1952, and the ACTUAL net investment on said date, the actual investment being $69,153,380.

"The investment in intrastate service shown above is the depreciated original cost of the applicant's investment on the dates shown, that is, $69,153,380 is the depreciated original cost of the company's property devoted to the public use as of July 31, 1952. *This depreciated original cost, or depreciated book cost, is very different from the current fair value of this property.* The testimony is to the effect that the current cost value of this property as of July 31, 1952, less depreciation, was $80,142,950, as compared with book cost, less depreciation, of $69,153,380, a difference of $10,989,570. (Italics supplied.)

"It should also be noted that July 31, 1952, the end of the test period, was two months prior to the date the application was filed, and that it is

now well into April 1953. Public utility rates are never made retroactive. Any increase in rates in this case must apply to the future, and cannot be published and put into effect without some further delay after authority is given. If the applicant continues to increase its intrastate net investment on an average of $775,928 per month, and its investment program for 1953 exceeds that for 1952, its actual net investment as of April 1, 1953, will amount to $75,327,885, and the current cost value of its property on said date will amount of $86,350,376. Summarizing the testimony with respect to the fairness of a rate base in this case for the purpose of fixing rates that will be just and reasonable for the present and immediate future, we have the following four rate bases for consideration:

"1. Average net for one year ending July 31, 1952..... ...........$64,317,910
2. Average net for 7 months ending July 31, 1952............... 66,297,406
3. Net investment as of July 31, 1952................ ..... .............. 69,153,380
4. Current cost value as of July 31, 1952.............................. 80,142,950

"Under normal conditions in which prices are stabilized and may be depended upon to remain reasonably constant, a rate of return found to have been earned on average net investment for a period of a year may be relied upon as approximately the rate of return that will continue in the future. But conditions are not normal. Depreciation which is based on original cost will not replace property retired. Additional capital is required for that purpose. As already stated, the high cost of construction under present conditions increases the average per telephone cost and decreases the rate of return at the rate of .033% per month. In an effort to provide some compensation for this loss in earnings, this Commission in prior Southern Bell rate cases has adopted as a rate base the actual net investment of the company at the end of the test period for the purpose of fixing rates to apply in the future.

"The Commission's staff and the applicant's staff do not agree as to the period to be considered in arriving at the amount of average net investment. They differ to the extent of $1,979,496, but both used test periods ending July 31, 1952, and in so far as the record shows they agree upon the amount of net investment on said date. Conditions have not materially changed since the last two Southern Bell rate cases were decided and the Commission is of the opinion that it can better consider the problems involved in this case *by again adopting for rate making purposes the net investment of the company* at the end of the test period which it finds to be $68,599,569 after making adjustments hereafter explained. Whether average net investment, net investment, or present fair value is adopted as a rate base, the Commission must give consideration, among other things, to original cost and present fair value of the appli-

cant's property, as required by G.S. 62-124, in its determination of just and reasonable rates.

### "RATE OF RETURN

"In arriving at a rate of return which the Commission finds to be within the zone of reasonableness for this particular company under the exigencies shown to exist, it is necessary to first pass upon certain items in controversy some of which relate to the rate base and some to operating expense. These items and the Commission's findings in respect thereto are as follows:

"1. CONSTRUCTION WORK IN PROGRESS ON WHICH INTEREST IS CAPITALIZED . . . (Omitted part not material on this appeal.)

". . . This Commission's last two decisions on this point are in accord with the decisions which exclude this item from the rate base, and it still supports this view. *However, the Commission having adopted net investment at the end of the test period as a rate base in this case,* it is of the opinion that it should exclude from the rate base only the construction in progress on which interest was capitalized on that date. The Commission finds this amount to be $520,591, plus $33,220 for premature transfers subject to capitalization of interest, or a total of $553,811. (Italics ours.)

.   .   .   .   .   .   .   .

"This Commission has consistently included in the rate base an allowance for cash working capital and material and supplies in such sums as it finds to be reasonable, depending upon the nature of the utility, the time between the rendition of service and the payment therefor, and the average operating expenses during said time, and it very seriously questions the advisability of changing its practice and policy based solely on the fact that a utility has on hand Federal tax funds.

.   .   .   .   .   .   .   .

"Excluding $553,811, the amount of construction work in progress on which interest is capitalized, and including working capital in the sum of $920,596 in the rate base for rate making purposes, reduces the amount of net investment at July 31, 1952, the end of the test period, to $68,599,569.

"4. PENSION COSTS. The applicant maintains a pension plan for its employees which applies to all employees regardless of period of service or age. The plan is non-contributory . . . (Not challenged on this appeal.) . . . The Commission finds no valid reason for excluding this pension cost from current operating expenses.

"Disallowing the rent items of $23,427 as an operating expense, allowing the two pension expense items of $46,400 and $30,750, and making adjustment for savings in taxes, results in an adjusted net operating income of $3,427,611, which the Commission finds to be the operating

income for the purpose of computing return on investment. Computing the rate of return on the adjusted rate base of $68,599,569, the net investment at July 31, 1952, shows a rate of return as of said date of 4.99%, and a rate of return of 4.27% on $80,142,950, the current cost value of applicant's property as of the same date. If the applicant's rate of return has continued to decline since October 1952 at the rate of .033%, as it did during the first ten months of 1952, the rates of return of 4.99% and 4.27% will be reduced to 4.72% and 4.00% respectively at the end of March 1953.

"Upon consideration of all the testimony in this case, the briefs submitted and the contentions of the parties, and particularly the contention of the Attorney-General of North Carolina with respect to the adequacy of a return of 6% under the facts in this particular case, the Commission is of the opinion and finds from the testimony that additional gross revenue sufficient to yield a return of 6% on said net investment of $68,599,569, or additional gross of $1,648,056 based upon stations and volume of business as of July 31, 1952, will be required to give the applicant a reasonable return on its North Carolina intrastate investment devoted to the public use, and that additional gross revenue in said sum will be fair and just to the applicant and to the public. In arriving at this conclusion the Commission has given careful consideration to the capital structure of the company, its debt ratio, its surplus account, its dividend payments and the earnings of the company as of July 31, 1952, and as of March 31, 1953, on each of the four rate bases to which the testimony relates, as shown below.

| "Rate Base | | Return 7/31/52 | Return 3/31/53 |
|---|---|---|---|
| "1. $64,317,910, | Average Net for one year | 6.40% | 6.136% |
| 2. 66,297,406, | Average Net for 7 months | 6.21% | 5.946% |
| 3. 68,599,569, | Net at end of period | 6.00% | 5.736% |
| 4. 80,142,950, | Current Cost at end of period | 5.14% | 4.876% |

"The Commission has some reservations as to the ability of the applicant to carry out its expansion in North Carolina for the year 1953 and earn a return of 6% for the year on any of the above rate bases under the rates herein approved.

"APPORTIONMENT OF RATE INCREASE

"The Commission has given very careful consideration to the differential between existing toll rates and local exchange rates in relation to the return on investment in these classes of service, and is of the opinion that the toll service should bear a greater portion of the total cost of

telephone service, to the end that local exchange service may be relieved of such a large portion of rate increases.

"The Commission has also given consideration to the spread between rates at the larger and smaller exchanges. The applicant owns and operates exchanges in most of the larger cities of the State, including Raleigh, Wilmington, Greensboro, Winston-Salem, Charlotte, Asheville, and others. These large exchanges, cost and value of the service considered, appear to be carrying more than their pro rata part of exchange service cost, and the average subscriber, in so far as ability to pay is concerned, is about the same at all exchanges.

"For the reasons stated, the Commission is of the opinion that the full amount of the requested increase in toll rates amounting to $891,000 should be approved, and that (the) remainder, or $757,056, should be equitably apportioned among the other classes of service, giving consideration to reducing the differential in subscriber rates between exchanges.

"IT IS THEREFORE ORDERED:

"1. That the applicant, Southern Bell Telephone and Telegraph Company, be, and it is hereby authorized to increase its North Carolina intrastate telephone rates and charges to produce additional annual gross revenue not exceeding $1,648,056 based upon stations and operations as of July 31, 1952.

"2. That the applicant prepare and submit to the Commission for approval a revision of its intrastate rates and charges to produce not in excess of $1,648,056 additional annual gross revenue, of which $891,000 shall be obtained from toll service, and the remainder, or $757,056, shall be apportioned equitably among other classes of service in keeping with the opinion herein expressed.

"3. That this cause be retained for final order after the applicant shall have complied with paragraph 2 of this order."

This order was entered 21 April 1953.

Thereafter Southern Bell filed with the Commission a schedule of intrastate charges as allowed in said order. On 24 April 1953 the Commission filed its final order authorizing, approving, and putting into effect the schedule as filed.

On 18 May 1953 the protestant filed a motion to dismiss Southern Bell's appeal, notice of which was filed 14 May 1953, more than ten days after the order of 21 April. The motion was overruled 29 May 1953.

On 8 May 1953 the protestant filed a petition for a rehearing for the reasons therein stated. The petition was denied. Southern Bell also filed a petition for rehearing but it did not appeal from the judgment entered in the court below. It is therefore bound by the rulings in that court which were raised by its petition for a rehearing filed with the Commission as well as by the judgment as a whole, as it may be modified by this Court.

The protestant excepted to the judgment entered as appears of record and appealed.

*Attorney-General McMullan and Assistant Attorneys-General Paylor and Lake for appellants.*

*Joyner & Howison, Taylor, Kitchin & Taylor, and Pierce & Blakeney for appellee, and Dan M. Byrd, Jr., Norman C. Frost, Jefferson Davis, and E. W. Smith appearing by brief.*

BARNHILL, J. The judgment of the court below, together with the explanatory statement and conclusions of law incorporated therein, evidences a very careful study and analysis of the record. In many respects its discussion might well be adopted as the opinion of this Court.

The primary questions posed by appellant's assignments of error may be boiled down to one simple issue: Did the Commission, in the consideration of the application of Southern Bell, follow the clear mandate of this statute, G.S. 62-124? The court below answered in the negative. A full consideration of the record compels an affirmance.

A *quasi*-public utility receives well-defined and valuable privileges not accorded a private, unregulated corporation. The government purposely grants it monopolistic rights and vests in it some of the powers of government such as the right of eminent domain. By no means the least of these governmental benefits is the assurance that its stockholders shall have a fair return on their investment.

In return the State reserves the right to supervise and regulate its operations and fix or approve the schedule of rates to be charged by it for its intrastate service.

This right to grant franchises to public service corporations and to fix or approve the rates to be charged by them for the services rendered the public rests in the Legislature. The General Assembly may act directly or it may delegate its authority to an administrative agency or commission of its own creation. However, no Act undertaking to delegate the rate-making function of the Legislature is valid unless the General Assembly prescribes rules and standards to guide the legislative agency in exercising the delegated authority. *Motsinger v. Perryman,* 218 N.C. 15, 9 S.E. 2d 511; *S. v. Harris,* 216 N.C. 746, 6 S.E. 2d 854; *Hospital v. Joint Committee,* 234 N.C. 673 (concurring opinion at p. 684), 68 S.E. 2d 862; *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310.

There is no defect in this respect in the Act delegating to the Utilities Commission the authority to grant franchises to, and fix the charges to be made for services rendered by, telephone and other public service corporations.

Having provided that "Every rate made, demanded or received by any public utility . . . shall be just and reasonable," G.S. 62-66, the Legislature then prescribed the considerations which should be weighed by the Commission in determining what is a just and reasonable rate in any particular case in the following language, to wit:

"In fixing any maximum rate or charge, or tariff of rates or charges for any common carrier, person or corporation subject to the provisions of this chapter, the Commission shall take into consideration if proved, or may require proof of, the value of the property of such carrier . . . used for the public in the consideration of such rate or charge or the fair value of the service rendered in determining the value of the property so being used for the convenience of the public. It shall furthermore consider the original cost of construction thereof and the amount expended in permanent improvements thereon and the present compared with the original cost of construction of all its property within the State; the probable earning capacity of such property under the particular rates proposed and the sum required to meet the operating expenses of such carrier . . . and all other facts that will enable it to determine what are reasonable and just rates, charges and tariffs." G.S. 62-124.

This statute has been characterized as an "old, rambling, and misty statutory declaration of the matters to be taken into account by the commission . . ." 12 N.C.L. 298. Be that as it may, it is the law in this State and will continue to be the law until amended, revised, or repealed by the Legislature. We have no intention to shut our eyes to its provisions or to circumvent the clear import of its language.

Necessarily, what is a "just and reasonable" rate which will produce a fair return on the investment depends on (1) the value of the investment—usually referred to in rate-making cases as the Rate Base—which earns the return; (2) the gross income received by the applicant from its authorized operations; (3) the amount to be deducted for operating expenses, which must include the amount of capital investment currently consumed in rendering the service; and (4) what rate constitutes a just and reasonable rate of return on the predetermined Rate Base. When these essential ultimate facts are established by findings of the Commission, the amount of additional gross revenue required to produce the desired net return becomes a mere matter of calculation. Due to changing economic conditions and other factors, the rate of return so fixed is not exact. Necessarily it is nothing more than an estimate.

In finding these essential, ultimate facts, the Commission must consider all the factors particularized in the statute and "all other facts that will enable it to determine what are reasonable and just rates, charges and tariffs." G.S. 62-124. It must then arrive at its own independent conclusion, without reference to any specific formula, as to (1) what consti-

tutes a fair value, for rate-making purposes, of applicant's investment used in rendering intrastate service—the Rate Base, and (2) what rate of return on the predetermined Rate Base will constitute a rate that is just and reasonable both to the applicant and to the public. While both original cost and replacement value are to be considered, neither constitutes a proper Rate Base.

In its order of 21 April the Commission discussed many, if not all, the factors which must be considered in determining the proper Rate Base, and concluded that there are four Rate Bases (set out in the foregoing statement of facts), any one of which it might accept. It then adopted the "book value" or "cost less depreciation" as the proper Rate Base.

Clearly this was in conflict with the express terms of the standard prescribed by the Legislature in G.S. 62-124. The conclusion is inescapable that by accepting the book value as the Rate Base, it, *ex necessitate,* excluded consideration of present cost of replacement and all other factors from effective consideration.

" 'Few words are so plain that the context or the occasion is without capacity to enlarge or narrow their extension.' Crawford, Stat. Constr., 276, sec. 174; *Watson Industries v. Shaw, Comr. of Revenue,* 235 N.C. 203, 69 S.E. 2d 505;" *Perry v. Stancil,* 237 N.C. 442. The Legislature, in using the term "value" in G.S. 62-124, was not referring to the original or the replacement cost or to the exchange or sales price it would command, as used or second-hand property, on the market. It had reference to the value of the property actually in use, serving its purpose as a part of a composite public utility, earning an income for its owner. It is, of course, in the main, "used" or "second-hand" but it is not for exchange or sale, as such. It is actually in use and will continue in use until it becomes obsolete or outworn. Its value, under these circumstances, is the value the Commission must seek to determine as the Rate Base for ascertaining what is a just and reasonable schedule of rates to be approved by it.

*Smyth v. Ames,* 169 U.S. 466, 42 L. Ed. 819, is the parent of G.S. 62-124. The language of our statute is lifted almost verbatim out of the opinion in that case. The subject here under consideration is there fully discussed. It is also discussed in *Corporation Com. v. Mfg. Co.,* 185 N.C. 17, 116 S.E. 178, and in numerous other cases cited by the appellant and appellee. As the case must be remanded for further hearing, we refrain from citing all the cases bearing directly upon the question. They are available to counsel and open to anyone interested in a further study of the subject.

Strictly speaking what is the fair value of applicant's investment in its intrastate business in this State and what constitutes a fair return thereon

are the primary questions before the Commission for decision. Yet this corporation operates in eighteen other states and is a part of a nation-wide system, controlled by one parent corporation, the capital stock of which occupies a commanding position on the market. It functions as one corporation. And, necessarily, its financial condition is affected by the rates charged and income received from its intrastate business in each and every one of the nineteen states in which it functions.

The record discloses that the applicant is in excellent financial condition, notwithstanding its net average return is only 4.8%. Since it is at least 5.4% in North Carolina, the net return in some of the other states must be lower than the average. North Carolina users of telephones are not to be required to furnish revenue to maintain applicant's financial condition which other states refuse to provide or to pay at rates materially higher than those charged in other territory served by the same corporation. A substantial differential might be considered some evidence that the rates charged in this State are unreasonable and unjust to the local public.

Furthermore, the financial condition of a public utility and the demand for its bonds and securities which affect its capacity to compete, on the open market, for additional equity and debt capital are ordinarily material considerations. But these factors are of little moment here, for the applicant has available at all times a fund provided by its parent company from which it may borrow at will for needed improvements or enlargements. Under the circumstances here disclosed, what it has to pay for its borrowings from this fund is of more importance.

These are some of the "other facts" the statute requires the Commission to consider. They may cause it to pause and consider whether the applicant is in the right forum.

The court below directed the Commission "in its determination of net operating income to allow depreciation as an expense of operation in such amount as in its judgment will be reasonably sufficient to restore currently the portion of capital investment currently consumed."

It is apparent the parties construe this instruction to mean that the current rather than the cost value shall be the basis for estimating depreciation allowances. If this is the correct interpretation of the language used by the trial judge, the instruction must be held for error.

For rate-making purposes a public utility is allowed to deduct annually as an operating expense so much of its capital investment as is actually consumed during the current year in rendering the service required of it. But the cost represents the amount of the investment, and it is the actual cost, not theretofore recouped by depreciation deductions, that must constitute the base for this allowance.

Broadly speaking, depreciation is the loss *not restored by current maintenance* which is due to all the factors causing the ultimate retirement of

the property. "While property remains in the plant, the estimated depreciation rate is applied to the book cost and the resulting amounts are charged currently as expenses of operation." *Lindheimer v. Illinois Bell Teleph. Co.,* 292 U.S. 151, 78 L. Ed. 1182; *Water Co. v. Alexandria,* 177 S.E. 454 (Va.); *Federal Power Com. v. Hope Nat. Gas Co.,* 320 U.S. 591, 88 L. Ed. 333.

"An annual depreciation allowance cannot logically or consistently be based upon fair value and reproduction cost, but rather the basis for computation should be upon the book cost of depreciable and depletable property." *Equitable Gas Co. v. Public Utility Com'n.,* 51 A. 2d 497; *Utah Power & Light Co. v. Public Service Commission,* 152 P. 2d 542; *City of Pittsburgh v. Public Util. Com'n.,* 90 A. 2d 607.

The whole purpose of the allowance is to maintain the integrity of the investment—to prevent a loss, not to assure a profit.

In this connection we note that the rate of depreciation allowed by the government for income tax purposes is not necessarily the proper rate to be allowed for rate-making purposes. Indeed, for rate-making purposes it would ordinarily be excessive, especially in respect to buildings and like permanent improvements.

Of necessity the government is required to adopt somewhat arbitrary rates for estimating allowable deductions in an income tax return as a result of which property is not infrequently fully depreciated before it is exhausted by its use. No doubt the applicant now has property that has been fully depreciated and yet has a "fair value" for use in its business.

The applicant is entitled to deduct each year as an operating expense only such depreciation as represents the investment currently consumed and not provided against by maintenance. Thus the integrity of the investment is maintained, and this is all the applicant has a right to demand. The rate should be fixed, as near as may be, so that it will extend over the usable life of the property being depreciated. Otherwise the allowance will be unjust either to the corporation or to the public.

Oftentimes property, particularly buildings and other structures, has a fair value long after it has been fully depreciated for income or ordinary bookkeeping purposes. Yet it cannot be gainsaid that such property still possesses and will continue to possess for many years a fair value for the purposes for which it is being used. It follows that it would be unfair to Southern Bell, under our rule, not to take into consideration the present fair value of property now in use but which has been fully depreciated for other purposes.

On the other hand, if the rate of depreciation allowed for rate-making purposes is in excess of the investment currently consumed, over and above maintenance costs, it is unfair to the public, for then the company

is permitted to recover annually a part of its investment which is not currently consumed.

We fully realize that this problem cannot be reduced to a mathematical certainty. For that reason it might be well for the Commission to promulgate a schedule of allowable rates of depreciation, for rate-making purposes, for different classes of property which will be as fair to all parties concerned as it is humanly possible to make it. However, that is a question for the Commission to decide. It may prefer to deal with each case as it arises.

The former allowance of a 6.50% rate of return is not *res judicata,* barring the Commission from fixing a lesser rate in this proceeding. Nor is the Commission compelled to provide a 6% rate of return which, under present conditions, may be considered by some a high rate for a corporation that is in effect assured a "reasonable and just" rate of return on its investment in good times and bad. It is only required to fix rates that are reasonable and just under the conditions as they now exist. And when it fixes a schedule of rates under the standard prescribed by the Legislature which is within the bounds of reason, it is as binding upon the courts as it is upon the interested parties.

Presently we are not prepared to say that a net return of 5.40%—over and above all taxes—is inadequate. That is a question for the Commission to decide.

Neither the Utilities Commission nor the courts are the keepers of the morals of a public utility. When, in fixing rates which will produce a fair return on the investment of a utility, it is made to appear it has on hand continuously a large sum of money it is using as working capital and to pay current bills for materials and supplies, that is a fact which must be taken into consideration. And if the fund on hand is sufficient, no additional sum should be allowed at the expense of the public.

The action of the public utility is neither condemned nor condoned, approved or disapproved. The question of any impropriety or illegality involved in such conduct is one that rests strictly between the public utility and the government to which the fund eventually will be paid. And, incidentally, we understand it is a common practice known to the government. In any event we do not feel that we are condoning improper conduct in approving this part of the judgment of the court below.

The appellant insists that this Court should reverse the judgment entered in the court below. But this we may not do. A reversal, in effect, would affirm the order of the Commission fixing a rate under a misconstruction of the applicable law. And it is for the Commission to say whether, on the showing made, considered in the light of the controlling statutory standard as here construed, Southern Bell should be permitted. at. this time, to increase its schedule of rates for intrastate service.

It is the prerogative of that agency to decide that question. It is an agency composed of men of special knowledge, observation, and experience in their field, and it has at hand a staff trained for this type of work. And the law imposes on it, not us, the duty to fix rates.

Of course, in determining the net operating income of applicant the Commission must take into consideration the net income to be produced by the greater number of telephones in service at the end of any test period adopted by it. Of this fact we assume the Commission is fully aware. Perhaps that is why the court below declined to incorporate a direction to that effect in its judgment.

The judgment entered in the court below must be modified in accord with this opinion. Thereupon the cause will be remanded to the Commission for further proceedings in accord therewith. It is so ordered.

Modified and affirmed.