STATE OF NORTH CAROLINA, EX REL. NORTH CAROLINA UTILITIES COMMISSION, MOTOR CARRIERS PARTICIPATING IN NORTH CAROLINA MOTOR CARRIERS ASSOCIATION, INC., AGENT, MOTOR FREIGHT TARIFF No. 8-I, N.C.U.C. No. 81 v. ATTORNEY GENERAL OF NORTH CAROLINA, THE TOBACCO ASSOCIATION OF THE UNITED STATES AND LEAF TOBACCO EXPORTERS ASSOCIATION

No. 6810UC315

(Filed 23 October 1968)

1. Carriers § 5;   Utilities Commission §§ 3, 6—   intrastate motor carrier rates — operating ratio of carriers

G.S. 62-146(g) requires the Utilities Commission to determine just and reasonable intrastate common motor carrier rates on the basis of the operating ratios of such carriers, that is, the ratio of their operating expenses to their operating revenues.

2. Carriers § 5;   Utilities Commission §§ 3, 6, 9—   intrastate motor carrier rates — operating ratio of carriers

An order of the Utilities Commission revising common motor carrier rates for the intrastate transportation of unmanufactured tobacco on the basis of operating ratios which do not reflect any actual separation of interstate and intrastate revenues and expenses or any separation of tobacco revenues and expenses of the carriers involved is contrary to law, and the cause is remanded to the Utilities Commission for the entry of a proper order based on the evidence in the record or for the taking of additional evidence.

APPEAL from North Carolina Utilities Commission (Commission) Order of 19 March 1968.

This proceeding began on 12 June 1967 by the filing by the North Carolina Motor Carriers Association (Motor Carriers Association), as agent, on behalf of various North Carolina intrastate trucking companies, of a tariff of revised rates and charges on the transportation and handling of various tobacco products. The tariff schedules were identified as Motor Freight Tariff No. 8-I, N.C.U.C. No. 81.

They were to become effective 12 July 1967, and Supplement No. 1 thereto was to become effective 24 July 1967. These trucking companies were authorized by the Commission to engage in the intrastate transportation of unmanufactured tobacco, leaf or scrap, in common carriage by motor vehicle between points and places within the State of North Carolina.

The rates involved apply to unmanufactured tobacco, which falls into two general categories: green tobacco, which means barn dried but not redried, and redried tobacco. With regard to green tobacco, the old rates, which had been in effect since 1952, were not based on a uniform mileage scale between all points in North Carolina. They were point to point rates which represented varying differences from a uniform scale depending upon the point of origin involved in a particular shipment. No change was made in the rates applicable to redried tobacco, and except for one variation, the old rates were brought forward. This variation fixed a minimum charge of twenty cents per hundred pounds.

The new rates were designed, primarily, to increase the revenue and, secondarily, to bring the existing rates into closer harmony with a uniform and nondiscriminatory mileage scale of rates. Where the old rates were below the uniform scale, the new rates increased them by a flat ten percent, but they were not to exceed this uniform scale. Where the old rates were in excess of the uniform scale, they were to remain in effect, which meant no reduction in any existing rate. Under the new rates, green tobacco in bundles or sheets carried a charge of six cents per hundred pounds above the charge for green tobacco packed in hogsheads or similar packing. The new rates for less than truckload shipments were double the new rates on tobacco packed in sheets. The minimum charge for the handling of a single shipment, less than a truckload shipment, was increased from two dollars and fifty cents to four dollars. This new rate schedule also included a rate of twenty cents per hundred pounds as a minimum.

By order of 11 July 1967, the application for the new rates was suspended, and an investigation into the justness and reasonableness of the proposed rates was ordered by the Commission. The carriers which proposed to participate in the new schedules were made respondents, and they had the burden of proving the justness and lawfulness of these new rates. Protests were filed by the Flue-Cured Tobacco Cooperative Stabilization Corporation, Tobacco Growers Services, Leaf Tobacco Exporters Association and The Tobacco Association of the United States. The Attorney General of North Carolina intervened on behalf of the using and consuming public.

Commencing 3 January 1968, formal public hearings were conducted by the Commission. On 19 March 1968, the Commission vacated and set aside the suspension order, and it entered an order approving the proposed rates, except in two particulars. One, the minimum charge for a single shipment was revised and made three dollars and fifty cents, rather than the proposed four dollars. Two, where the distance shipped did not exceed twenty miles, the minimum rate was reduced from twenty cents per hundred pounds to eighteen cents per hundred pounds. On 29 April 1968, The Tobacco Association of the United States, the Leaf Tobacco Exporters Association, and the Attorney General of North Carolina filed exceptions and gave notice of appeal to the Court of Appeals.

*Thomas Wade Bruton, Attorney General, by George A. Goodwyn, Assistant Attorney General.*

*Malcolm B. Seawell and Boyce, Lake & Burns by F. Kent Burns, Attorneys for The Tobacco Association of the United States and Leaf Tobacco Exporters Association, appellants.*

*Bailey, Dixon & Wooten by J. Ruffin Bailey, Attorneys for Motor Carriers, appellees.*

*Edward B. Hipp and Larry G. Ford, Attorneys for North Carolina Utilities Commission, appellee.*

CAMPBELL, J.

The protestants say that the order is improper for four reasons: (1) the Commission failed to find the intrastate operating ratios of the carriers involved and the effect on such ratios of the new rate; (2) there was no competent, material and substantial evidence in view of the entire record to establish a new rate; (3) the Commission compared the new rate with an unregulated interstate rate; (4) the Commission failed to determine operating revenues under the present rates and then compare them to the proposed rates before granting an increase.

[1]    The determination of motor carrier rates for intrastate transportation of commodities in North Carolina is fixed by statute. G.S. 62-146(g) provides:

"In any proceeding to determine the justness or reasonableness of any rate of any common carrier by motor vehicle, there shall not be taken into consideration or allowed as evidence any elements of value of the property of such carrier, good will, earning power, or the certificate under which such carrier is operat-

ing, and such rates shall be fixed and approved, subject to the provisions of subsection (h) hereof, on the basis of the operating ratios of such carriers, being the ratio of their operating expenses to their operating revenues, at a ratio to be determined by the Commission. . . ."

G.S. 62-146(h) provides:

"In the exercise of its power to prescribe just and reasonable rates and charges for the transportation of property in intrastate commerce by common carriers by motor vehicle, and classifications, regulations, and practices relating thereto, the Commission shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon movement of traffic by the carrier or carriers for which rates are prescribed; to the need in the public interest of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service; and to the need of revenues sufficient to enable such carriers under honest, economical, and efficient management to provide such service."

An operating ratio of one hundred percent means that for every dollar of freight revenue received, the carrier spends a dollar in operating expenses. When the operating ratio exceeds one hundred percent, it means that the expenses exceed the revenues. The lower the operating ratio, the more profitable the operation is to the carrier.

The carriers say that material and substantial evidence was offered to establish the operating ratios of the motor carriers based on revenues and expenses incurred in the North Carolina operations alone, and that these operating ratios are the ratios set out in the Commission's order; that based thereon, the carriers involved had an operating ratio in excess of ninety-six percent, and that the evidence established that operating expenses were increasing faster than revenues thereby causing an increase in the operating ratio. They further assert that an operating ratio above ninety-five percent fails to provide, in the public interest, adequate and efficient transportation service and that, therefore, the evidence was sufficient to justify the granting of an increase in rates by the Commission. Be this as it may, the Commission in its order (R p 52 and 53) specifically concluded:

"The operating ratios do not reflect any actual separation of interstate and intrastate revenues and expenses or any separa-

tion of tobacco revenues and expenses from those on other traffic.

. . . .

The operating ratios of the carriers hereinbefore enumerated do not reflect a separation of interstate and intrastate revenues and expenses as contemplated by G.S. 62-146(h). . . .

The North Carolina Supreme Court, in *State v. State*, 243 N.C. 12, said that the order of the Utilities Commission increasing intrastate rates of the State rail carriers so that such rates would conform with an increase in interstate rates allowed by the Interstate Commerce Commission was invalid where the order was unsupported by proof of the fair value of the properties of the carriers used and useful in conducting their intrastate business, separate and apart from their interstate business. Although a different section of Chapter 62 governs rate-making for rail carriers, the principle of separating interstate and intrastate revenues and expenses applies to both modes of transportation."

[2] Therefore, even though there may have been evidence presented in the record from which the Commission could have made a proper finding of intrastate experience, the Commission in fact made no such finding. In its own conclusions, it was stated that "[t]he operating ratios do not reflect any actual separation of interstate and intrastate revenues and expenses or any separation of tobacco revenues and expenses from those on other traffic." Thus, the Commission's order fixing rates in the face of this conclusion was contrary to law.

In their brief, the attorneys for the Commission attempted to eliminate this part of the order by dismissing it as "not necessary to the decision." This Court, however, cannot eliminate a portion of an order and insert a new finding. We must take the order as it is written and assume that the Commission intended to rely on it *in toto*.

Paraphrasing Chief Justice Barnhill in *Utilities Commission v. State*, 243 N.C. 685, 91 S.E. 2d 899, this Court fully realizes that the operating ratios for the movement of tobacco in intrastate traffic cannot be determined with mathematical exactitude. But the carriers can no doubt approximate the rateable proportion of their operating ratios from tobacco movements in intrastate traffic and offer evidence of other facts and circumstances in respect thereto sufficient in probative force to enable the Commission to make findings of fact under our statute and to issue such orders as the findings of

fact may warrant. In any event, this Court knows of no statute or rule of law which denies the carriers the right to attempt to do so.

It may well be that the carriers in this case have presented evidence sufficient to justify findings by the Commission in support of the present order. "It is the prerogative of that agency to decide that question. It is an agency composed of men of special knowledge, observation, and experience in their field, and it has at hand a staff trained for this type of work. And the law imposes on it, not us, the duty to fix rates." *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133.

[2] The public interest demands and requires that adequate and efficient transportation be provided by the carriers, in return for which they are entitled to proper and compensatory rates. However, when the conclusions show that an order, such as the one in the instant case, is based on an erroneous premise, we can only remand it to the Commission for the entry of a proper order with proper findings and conclusions based on the evidence in the record or for the taking of such additional evidence as the Commission may find necessary.

Remanded.

MALLARD, C.J., and MORRIS, J., concur.