STATE OF NORTH CAROLINA, EX REL., UTILITIES COMMISSION v. LEE TELEPHONE COMPANY.

(Filed 24 February, 1965.)

**1. Utilities Commission § 6—**

G.S. 62-133 which supercedes G.S. 62-124 is not in conflict with the former statute but merely codifies the former statute as interpreted by the Supreme Court.

**2. Same—**

·Whether a given rate is just and reasonable depends largely upon whether .the Utilities Commission has placed a fair value on the property of the utility useful in producing its revenue in this State.

**3. Same—**

A finding by the Utilities Commission as to the fair value of a utility's property within this State, which finding is made without giving any consideration to replacement costs as required by G.S. 62-133(b)(1), cannot be allowed to stand, since it is not supported by competent, material and substantial evidence.

**4. Same—**

When a utility operates in two or more states the operations must be treated as separate businesses for the purpose of rate regulation, and the Commission must fix a rate which will give a reasonable or fair return on the company's investment within this State without reference to the company's return on property in another state or its overall return on all its operations.

**5. Utilities Commission § 1—**

It is the function of the Utilities Commission and not the courts to fix rates of a public utility, and upon a petition for increase in rates the Commission is not required to accept the proposed rates or to reject them all together.

APPEAL by defendant from *Copeland, S.J.,* September 1964 nonjury Civil Session of WAKE. This case was docketed in the Supreme Court as No. 480 and argued at the Fall Term 1964.

This proceeding originated upon the written application of Lee Telephone Company, hereinafter called Company, which application was filed on 16 August 1963 with the North Carolina Utilities Commission, hereinafter called Commission, for an order permitting the Company to adjust its existing rates for local telephone service within the State of North Carolina.

The Honorable T. Clarence Stone filed a protest to the application.

The home of the Company is in Martinsville, Virginia. Through its telephone exchanges in Virginia, at the time of the hearing before the Commission, the Company served 28,776 stations. The company rendered local and toll telephone service in the counties of Rockingham, Stokes and Forsyth within the State of North Carolina, and maintained exchanges in those counties in Madison, Stoneville, Walkertown, Walnut Cove and Danbury. These exchanges served 7,610 stations in North Carolina, or 21% of the total stations served by the Company in North Carolina and Virginia combined.

The proposed increase in rates for local service in North Carolina is calculated to provide $55,633.00 in additional gross revenue, of which only $23,595.00 would accrue to the Company's use. This income would add an average of $7.31 in additional charges annually for each station in North Carolina. Toll rates are not involved in this proceeding.

The Commission's findings of fact are as follows:

"1.   Lee Telephone Company is a public utility engaged in rendering local and toll telephone service under a certificate of public convenience and necessity issued by this Commission and is subject to regulation of this Commission.

"2.   It operates in the States of North Carolina and Virginia.

"3.   The fair value of the Company's property in North Carolina used and useful in rendering service and producing revenue is $2,100,000.00.

"4.   The rates and charges in effect for the Company as of July 31, 1963 and which the Company applied during the 12 months' period ending July 31, 1963 are just and reasonable.

"5.   The rates and charges attached to the Company's application reflecting increases on local telephone service in North Carolina are unjust and unreasonable, and the application for the approval thereof should be denied.

"6.   The Company was earning a fair rate of return on the fair value of its property in North Carolina as of July 31, 1963."

In its conclusions, the Commission sets out that the North Carolina operation on its present rates, after deducting fixed charges, dividends

and other allowable deductions, will produce a surplus of $243.00 annually, and would produce, if the requested increase were allowed, a surplus in the North Carolina operation of $23,838.00.

The Commission further sets out in its conclusions the following:

> "Including allowance for working capital and accounting and *pro forma* adjustments, which includes $84,124.00 of Virginia property allocated to North Carolina plant, the Staff arrived at an average net investment in North Carolina of $1,963,236.00 before proposed increases and $1,950,455.00 after increase effect. It (the Staff) determines the net end of the period investment in North Carolina, including cash working capital and after accounting and *pro forma* adjustments, which involves the allocation of some $84,000.00 of Virginia property to North Carolina plant, to be $2,152,949.00."

The exhibit of the Commission's Staff, among other things, states:

> "The Staff has not included a schedule reflecting the rate of return on an end-of-period rate base (which test period was from 1 August 1962 through 31 July 1963); however, using the formula adopted by the Staff, that is, applying a station growth factor to the net operating income for return, the rate of return after *pro forma* adjustments would be 4.92% and 6.06% after the requested increase in rates."

The Company, according to the Commission, did not use average net investment. It determined North Carolina net investment as of the end of the period, including allowance for cash working capital and after accounting and *pro forma* adjustments, which includes $84,124.00 of Virginia property allocated to North Carolina and giving effect to interest which was capitalized on plant under construction at $2,112,810.00. The Company offered evidence to the effect that the fair value of the North Carolina property was at least $2,250,000.00.

The Commission, based on a valuation fixed by its Staff of $1,963,236.00, determined that the Company's rate of return on said valuation was 5.20%.

The Company offered evidence tending to show that its gross investment in its plant in service in North Carolina in 1949, when the present rates went into effect, was $476,000.00, or an average investment per station of $266.00; that on 31 July 1963 the gross investment was $2,853,500.00, or an average investment per station of $375.00.

The capital structure of the Company as a whole, on 31 July 1963, consisted of long term debt in the amount of $4,630,000.00, short term bank notes in the amount of $875,000.00, and equity capital in the

amount of $4,256,725.00. The ratio of debt capital to total capitalization, including short term bank notes, is 56.4%. Exclusive of the short term bank notes, the debt ratio is approximately 52%. The last two issues of bonds sold by the Company, maturing in 1978 and 1986 respectively, totaling $1,600,000.00, bear 5% interest, and all the short term bank notes are financed at 5%.

Based on the cost of a new exchange at Walkertown, which presently serves 1,374 stations, the evidence tends to show a cost per station of $410.00. Using $410.00 as replacement cost of the Company's 7,610 stations in North Carolina, the current cost of the Company's North Carolina plant would be $3,120,100.00, less depreciation of 28.94% heretofore taken, amounting to a deduction or reserve of $902,-957.00, leaving the cost of the North Carolina plant, less depreciation, at $2,217,143.00. When the additional cost of plant under construction is added thereto, plus the allocated portion of the properties in Virginia chargeable to the North Carolina operation, the total current cost, according to the Company's evidence, on all properties used and useful in rendering service in North Carolina, is $2,354,174.00.

The Commission denied the Company any increase in its rates and dismissed the proceeding.

The defendant appealed to the Superior Court which overruled all the defendant's exceptions, affirmed the order of the Commission and dismissed the appeal. The defendant appeals, assigning error.

*Maupin, Taylor & Ellis; Lake, Boyce & Lake for defendant.*
*Edward B. Hipp for the Commission.*
*Attorney General Bruton, Asst. Attorney General Charles W. Barbee, Jr., and Thomas J. White for protestant.*

DENNY, C.J. The appellant assigns as error the failure of the court below to sustain its exception to the Commission's finding of fact No. 3, as follows: "The fair value of the Company's property in North Carolina used and useful in rendering service and producing revenue is $2,100,000.00," for that such finding of fact is unsupported by competent, material and substantial evidence.

G.S. 62-124 governed the manner of ascertaining the value of property for rate purposes at the time the petition herein was filed on 16 August 1963. However, Chapter 1165 of the 1963 Session Laws of North Carolina repealed G.S. 62-124 as of 1 January 1964, which was prior to the date the Commission's order was signed. Even so, we hold there is no conflict between the provisions of the former statute and the present one, that the present statute merely codified the former statute

as interpreted by this Court. The present statute, now codified as G.S. 62-133, reads as follows:

"(a)   In fixing the rates for any public utility subject to the provisions of this chapter, other than motor carriers, the Commission shall fix such rates as shall be fair both to the public utility and to the consumer.

"(b)   In fixing such rates, the Commission shall:

"(1)   Ascertain the fair value of the public utility's property used and useful in providing the service rendered to the public within this State, considering the reasonable original cost of the property less that portion of the cost which has been consumed by previous use recovered by depreciation expense, the replacement cost of the property, and any other factors relevant to the present fair value of the property. Replacement cost may be determined by trending such reasonable depreciated cost to current cost levels, or. by any other reasonable method.

"(2)   Estimate such public utility's revenue under the present and proposed rates.

"(3)   Ascertain such public utility's reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation.

"(4)   Fix such rate of return on the fair value of the property as will enable the public utility by sound management to produce a fair profit for its stockholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.

"(5)   Fix such rates to be charged by the public utility as will earn in addition to reasonable operating expenses ascertained pursuant to paragraph (3) of this subsection the rate of return fixed pursuant to paragraph (4) on the fair value of the public utility's property ascertained pursuant to paragraph (1).

"(c)   The public utility's property and its fair value shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time.

"(d)   The Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates.

"(e)   The fixing of a rate of return shall not bar the fixing of a different rate of return in a subsequent proceeding."

According to the Commission's conclusions, its own Staff determined the net end of period investment of the defendant in North Carolina to be $2,152,949.00, while the Company determined the depreciated value of its property in North Carolina at the end of the test period to be $2,112,810.00. Insofar as the record shows, no consideration was given to replacement costs in arriving at either of the above figures. Moreover, the Commission's Staff in arriving at a return of 5.20% used "an average net rate base, including working capital and after accounting and pro forma adjustments, and before any increase, of $1,963,236.00." The Company offered evidence tending to show the depreciated replacement costs of its North Carolina properties to be $2,354,174.00.

Whether a 4, 5 or 6% return is just and reasonable depends very largely on whether the Commission has placed a fair value on the property of the utility which is used and useful in producing its revenue. *Utilities Com. v. Gas Co.,* 254 N.C. 536, 119 S.E. 2d 469; *Smyth v. Ames,* 169 U.S. 466, 42 L. Ed. 819, 18 S. Ct. 418.

In *Utilities Com. v. State* and *Utilities Com. v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133, Barnhill, J., later C.J., said:

"Necessarily, what is a 'just and reasonable' rate which will produce a fair return on the investment depends on (1) the value of the investment — usually referred to in rate-making cases as the Rate Base — which earns the return; (2) the gross income received by the applicant from its authorized operations; (3) the amount to be deducted for operating expenses, which must include the amount of capital investment currently consumed in rendering the service; and (4) what rate constitutes a just and reasonable rate of return on the predetermined Rate Base. When these essential ultimate facts are established by findings of the Commission, the amount of additional gross revenue required to produce the desired net return becomes a mere matter of calculation. * * *"

On the findings in this record we are unable to determine whether the value of $2,100,000.00 fixed by the Commission was as of the end of the test period or not. Furthermore there is no evidence tending to show that the Commission gave any consideration whatever to replace-

ment cost as required by the statute. In our opinion, finding of fact No. 3 is not supported by competent, material and substantial evidence.

In *Utilities Com. v. Gas Co., supra,* the Commission said it gave only minimal consideration to replacement cost but did not exclude it from consideration. In affirming an order of the court below, remanding the case to the Commission for further hearing, Higgins, J., speaking for the Court, said:

> "In these times of increased construction costs and decreased dollar value, trended cost evidence deserves weight in proportion to the accuracy of the tests and their intelligent application. The objections to such evidence apparently came from jurisdictions where the base rate is fixed at 'book value' or 'original cost' rather than present value. Of course, the book value or original cost can be ascertained with exactness from the books and records. Trended cost is useful only when it becomes necessary to fix the present value of facilities constructed when the cost was low and replacement has become expensive — our case. The trended cost takes into account the type of facility, its age, its original and replacement cost, terrain, location, its probable useful life, and other factors. Such evidence is not conclusive but it does appear to be a useful guide in determining value of facilities * * *. Engineers and accountants have, through examination, investigation and experience in the field, devised tables, studies, and indices designed and intended as guides in translating original cost into present value. A better method * * * is not suggested."

The mere minimal consideration of the replacement cost was held to be erroneous, citing *City of Richmond v. Henrico County,* 185 Va. 176, 37 S.E. 2d 873, modified 185 Va. 859, 41 S.E. 2d 35; *Duquesne Light Co. v. Pennsylvania Public Utilities,* 176 Pa. Super. 568, 107 A. 2d 745; *Railroad Commission v. Houston Nat. Gas Corp.,* 155 Tex. 502, 289 S.W. 2d 559.

This assignment of error is sustained.

It is apparent from a perusal of the record that the Commission and its Staff found it difficult to consider the rate of return from the North Carolina properties separate and apart from the rate of return of the Company as a whole.

The Utilities Commission of this State does not have the right to fix less than a reasonable or fair rate of return on the Company's investment in North Carolina because the Utilities Commission in Virginia may have fixed rates in that State which, in the opinion of the Utilities Commission in this State, gives the Company a reasonable return

on its entire properties when its Virginia and North Carolina revenues are combined. *Smyth v. Ames, supra.*

In the case of *Corporation Com. v. Mfg. Co.,* 185 N.C. 17, 116 S.E. 178, in considering the same question involved here, this Court held:

> "* * * (T)he Corporation Commission (now the Utilities Commission) in this State is empowered and directed to make reasonable and just rates as applied to the distribution and sale of power in this State and not otherwise, and such power cannot be directly controlled or weakened by conditions existent in other states, either from the action or nonaction of official bodies there, or the dealings between private parties. To hold otherwise would, in its practical operation, be to withdraw or nullify the powers that the statute professes to confer and should not for a moment be entertained. * * *"

In *United Gas Pipe Line Co. v. Louisiana Public Serv. Com'n.,* 241 La. 687, 130 S. 2d 652, the Supreme Court of Louisiana recently said:

> "* * * '(T)he reasonableness of the rates to be fixed by the state must be decided with reference exclusively to what is just and reasonable in respect of domestic business.'"

When a company operates in two or more states, the operations are treated as separate businesses for the purpose of rate regulation. An inadequate return in Virginia would not of itself justify a rate increase in North Carolina, nor would a high rate of return in Virginia justify less than a fair and reasonable rate in North Carolina. G.S. 62-133.

The responsibility for fixing rates rests with the Utilities Commission and not on this Court. However, there is nothing in the statutes that requires the Commission to accept the rate or rates proposed, or to reject them altogether. *Utilities Com. v. Light Co.* and *Utilities Com. v. Carolinas Committee,* 250 N.C. 421, 109 S.E. 2d 253.

The Superior Court of Wake County will remand this proceeding to the Utilities Commission for further hearing in accord with the provisions of G.S. 62-133 and this opinion.

Remanded.