STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION, LEE TELE-
PHONE COMPANY (APPLICANT), AND COMMISSION STAFF (INTERVENOR), AP-
PELLEES v. ROBERT MORGAN, ATTORNEY GENERAL OF NORTH CAROLINA
(INTERVENOR IN BEHALF OF THE USING AND CONSUMING PUBLIC OF NORTH
CAROLINA), AND WALKERTOWN TELEPHONE EXCHANGE COMMITTEE (PRO-
TESTANT), APPELLANTS

No. 7010UC103

(Filed 6 May 1970)

**1. Telephone and Telegraph Companies § 1; Utilities Commission § 6—
telephone rate increase — poor service by utility**

In a hearing upon application by a telephone company for a rate in-
crease in its franchise area, the Utilities Commission was authorized to
grant the company an increase in the rates charged to its customers not-
withstanding a finding by the Commission that the quality of service ren-
dered by the company was poor and substandard.

**2. Utilities Commission § 6— rate determination — quality of service**

The Utilities Commission is authorized to consider quality of service
as a factor in determining what constitutes just and reasonable rates to
be charged by a utility. G.S. 62-133.

**3. Utilities Commission §§ 6, 9— rate determination — prerogative of
the Commission**

It is the prerogative of the Utilities Commission, and not the appellate
court, to decide the question as to what constitutes fair and reasonable
rates that may be charged by a utility.

**4. Utilities Commission § 6— appeal from order of rate increase —
contention that test period was unrepresentative**

On appeal from an order of the Utilities Commission granting a rate
increase to a telephone company, there is no merit to the Attorney Gen-
eral's contention that the test period used by the Commission was un-
representative in that more substantial investments were made in plant
and equipment during this twelve-month period than in any of the pre-
ceding twelve-month periods.

**5. Utilities Commission § 6— rate determination — value of plant and
service — end of test period**

In fixing the rate for a public utility, the value of the utility's plant
and service must be determined as of the end of the test period used in
the hearing. G.S. 62-133(c).

**6. Utilities Commission § 6; Telephone and Telegraph Companies § 1—
rate determination — plant under construction — interest during con-
struction**

In fixing the rate for a telephone company, it was proper for the Util-
ities Commission (1) to include in the rate base the value of the com-
pany's telephone plant under construction but not yet in operation and
(2) to credit the interest during construction to the company's operating
income.

**7. Utilities Commission § 6— determination of rate base — factors considered**

It is the duty of the Utilities Commission to arrive at an independent rate base upon consideration of all factors, including original cost, replacement and trended cost; and the Commission must exercise its independent judgment in doing so.

**8. Utilities Commission § 6; Telephone and Telegraph Companies § 1— transaction between utility and supplier — reasonableness of profits — inquiry by Commission**

In fixing the rates for a telephone company owned by a parent holding company, the Utilities Commission was acting within its discretion in postponing an investigation into the reasonableness of profits earned on materials sold to the telephone company by a supply company that was also owned by the parent company, where (1) the supply company had been operating for only a year at the time of the rate hearing and (2) the Commission, in its findings of fact, expressly took notice of the relationship between the telephone company and its supplier and reserved for future consideration any investigation into the reasonableness of profits.

**9. Utilities Commission § 6— rate determination — transaction between utility and unregulated supplier**

It is the duty of the regulatory commission to look closely at transactions between utility operating companies and affiliated supply companies to be sure that the public is not required to pay rates based on excessive costs resulting from excessive profits earned by an unregulated supplier.

**10. Utilities Commission § 6; Telephone and Telegraph Companies § 1 — determination of working capital — advance payments by customers**

In fixing the rates for a telephone company, the Utilities Commission was not required as a matter of law to credit to the company's working capital requirements the amounts paid by its customers in advance of monthly services rendered.

**11. Utilities Commission § 6; Telephone and Telegraph Companies § 1 — rate determination — finding that existing rates were inadequate**

In fixing the rate for a telephone company, the Commission's finding that the new rate represented a fair rate of return on the fair value of the company's utility property was tantamount to a finding that the existing rates were inadequate.

**12. Utilities Commission § 9— appeal from rate increase — abandonment of exceptions**

On appeal by the Attorney General from an order of the Utilities Commission granting a rate increase to a telephone company, exceptions to the Commission's findings and conclusions are deemed abandoned where no argument or citation of authority is brought forward in their support. Rule of Practice in the Court of Appeals No. 28.

APPEAL by Attorney General from order of Utilities Commission dated 28 July 1969.

On 2 October 1968, Lee Telephone Company (Lee) applied to the North Carolina Utilities Commission for authority to increase its monthly rates for telephone service in its franchise area of North Carolina lying in the counties of Rockingham, Stokes and Forsyth, and serving exchanges at Danbury, Madison, Stoneville, Walkertown, Walnut Cove, Quaker Gap, and Sandy Ridge. The total increase sought was $239,973. No increase was sought for toll rates.

On 16 December the Attorney General of North Carolina intervened on behalf of "the using and consuming public," and protested the proposed rate increase. Thereafter, a committee of applicant's customers who are served through the Walkertown exchange also intervened as a party protestant.

On 6 January 1969 the proceeding was enlarged by order of the Commission to include service complaints and investigation in addition to the rate increase inquiry, and hearings were conducted in March of 1969 on both phases of the case.

Lee admitted certain deficiencies and offered evidence that since the system was acquired by Lee's parent company in 1965, aggressive steps have been taken to improve service. There was also evidence tending to show that considerable future improvements are planned and that an increase in rates is needed to attract the investment capital necessary to implement the improvements and upgrade service.

Lee offered further evidence tending to show that at the end of the test period, it had an investment rate base applicable to its North Carolina operations of $5,313,339. The addition of working capital allowance of $118,597 and the subtraction of an applicable reserve for depreciation in the amount of $1,234,290 resulted in a net end-of-the-period rate base of $4,197,646. The evidence of the Commission staff indicated a net rate base of a slightly smaller amount due largely to the staff's deduction of income tax accruals in the amount of $28,469 from working capital requirements. An extensive study consisting of 93 pages was presented by Lee and tended to show that the net trended original cost of its utility plant applicable to North Carolina was $5,009,100. No other evidence was offered with respect to trended costs and it does not appear that Lee's evidence as to this factor was seriously challenged in the hearings before the Commission.

The Commission found the original cost rate base to be in accordance with the staff's evidence and, upon a consideration of this evidence and evidence of the trended original cost, found the fair value

of Lee's property used and useful in providing the service rendered to the public within North Carolina to be $4,500,000. Other findings made by the Commission with respect to costs, present and proposed rates, and rates found to be reasonable are as follows:

"9. The evidence presented by the Staff and the Company tends to show that the Company's annual gross operating revenues at the end of the test period were $847,886, and we so find.

10. The evidence as presented tends to show Company gross operating revenues under the proposed rates, (1) by the Company to be $1,250,001, and (2) by the Staff to be $1,247,971. We find annual gross operating revenues under the rates hereinafter found to be reasonable and if approved would be $1,155,697.

11. We find actual, reasonable and legitimate total operating expenses to be $430,044 from evidence presented by the Company and the Staff tending to show the same to be $434,144 and $430,044 respectively.

12. Annual depreciation expense evidence by the Company shows an expense of $206,014, and the evidence by the Staff shows the same to be $204,837. We find the reasonable annual cost consumed by depreciation is $204,837.

13. The Company and Staff evidence places annual taxes under the present and the proposed rates as follows:

|  | Present Rates | Proposed Rates |
|---|---|---|
| By Company | $169,596 | $308,926 |
| By Staff | $161,337 | $298,160 |

We find a reasonable and actual annual tax liability to be $161,337 under the present rates and $298,160 under the proposed rates and that under the rates hereinafter found reasonable and approved that the Company's annual tax liability is estimated at $244,037.

14. The Company's evidence tends to show a net operating income for return of $216,900 under present rates and $316,673 under the proposed rates. The Staff shows $233,326 and $333,009, respectively. Allowing for all operating revenue deductions herein found reasonable, the Company would be permitted net operating income for return of $292,500 under the rates hereinafter found reasonable and approved.

15. Capital structure allocated to North Carolina as hereto-

fore found shows total capitalization of $4,139,575, consisting of $1,720,656 long-term debt (41.57%) at interest rates varying from 3% to 6⅜%, equity capital (34.43%) totaling $1,425,319 and comprised of $542,439 in common capital stock, $207,623 in premium on common stock and stock expense, and $675,257 in earned surplus; and short-term debt (24.0%) of $993,600 at 6% and 6½% of which $367,200 is advances from the parent company.

16. Lee's reasonable annual fixed charges are $88,353 for long-term debt and $62,316 for short-term debt, for a total annual actual and reasonable debt service requirement of $150,669.

17. Applicant is earning 5.74% on its common equity attributed to North Carolina operations under present rates. The Company will earn 12.73% on its common equity under the proposed rates and will be permitted to earn 9.89% return on common equity under the rates hereinafter found reasonable and approved.

18. The Company is earning a rate of return on the fair value of its property as herein found of 5.19% under present rates; it would earn 7.40% under the proposed rates, and will be permitted to earn 6.50% under the rates hereinafter found reasonable and approved.

19. Giving full consideration to all the evidence, facts, and circumstances in this case, we find a fair rate of return on the fair value of the Company's utility property is 6.50%.

20. Rates as proposed by the Company would permit the Company to earn, in addition to the reasonable operating revenue deductions herein found, a rate of return of 7.40% on the fair value of the Company's property herein found. To the extent such proposed rates produce, in addition to the reasonable operating revenue deductions herein found, a rate of return in excess of 6.50% on the fair value of the Company's property as herein found (i.e., $4,500,000), such rates are excessive, unjust and unreasonable. Rates charged in accordance with the schedule hereto attached and marked Appendix "A" and made a part hereof, will permit the Company to earn, in addition to the reasonable operating revenue deductions herein found, a fair rate of return on the fair value of its public utility property used and useful in providing the service rendered to the public within this State and constitutes rates that are just and reasonable, both to the Applicant and to the public."

Based on the above findings and other findings and conclusions

hereinafter discussed in the opinion, the Commission, with two members dissenting, entered an order approving an increase in rates in the amount of $142,437 annually or 59% of the increase requested. The Attorney General and the Walkertown Committee gave notice of appeal from the Commission's order but only the Attorney General appeared and filed a brief in this court.

*Edward B. Hipp and Larry G. Ford for North Carolina Utilities Commission.*

*Burns, Long & Wood by Richard G. Long; Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons by Melvin A. Hardies and Donald W. Glaves; and Duane T. Swanson for Lee Telephone Company.*

*Robert Morgan, Attorney General, by Jean A. Benoy, Deputy Attorney General (Intervenor).*

*No appearance for Walkertown Telephone Exchange Committee (Protestant).*

GRAHAM, J.

The Attorney General, appellant, brings forth and argues ten contentions which are set forth in his brief in the form of questions and which are based on numerous exceptions and assignments of error to the Commission's findings and conclusions.

[1]   The first, second and seventh contentions question the authority of the Commission to grant the rate increase in light of the Commission's determination that the service rendered by Lee is substandard. These contentions challenge in particular the Commission's finding of fact No. 21 and its conclusions Nos. 3 and 4 which are as follows:

"21.   The quality of service rendered by Lee Telephone Company in this State is poor. In a measure, the Company conceded the overall justification for these service complaints and stated its plans and intentions for improving its North Carolina facilities in the near future. The inadequate and poor quality telephone service offered by the applicant in this State relates to many factors such as the nature, size and extent of the territory served, the fact that the telephone facilities when acquired by Central Telephone Company in 1965 were engineered in such a way as to engender such service, the plant was inadequate and inefficient and therefore many of their problems were inherited upon purchase. However we find from the nature and extent of the complaints made and from statements and testi-

mony of company representatives that the service being rendered by Lee is substandard, and that such grade of service reflects the failure of the Company to take those steps necessary for the improvement of toll service, local central office service, proper maintenance and the reduction of unsatisfactory multiparty main station service as is economically feasible, as well as its failure to eliminate traffic overloads on toll trunks, extended area service trunks and central office equipment groups, and its failure to take sufficient action to improve transmission and reduce noise levels.

\*          \*          \*

3. The statutory rate-making formula is controlling in this matter. We have considered the substandard quality of service being rendered by Lee as one element bearing upon the value of its utility investment and the rate it should be permitted to earn, along with other factors, including but not limited to, the nature, size and extent of the territory served, and the condition and level of its telephone facilities when acquired by Central Telephone Company in 1965. We further conclude that it is our responsibility to require the highest standards of service consistent with reasonable rates, and that such responsibility can only be discharged with reasonable regard to all facts and circumstances in each case and within the limits of the statutory ratemaking formula.

4. From the record in this case, we conclude that the telephone service being offered the public in North Carolina by Lee is inadequate and of poor quality particularly in the areas of toll service and local central office' service. Since our last order in June 1968, the Applicant has reduced the high percentage of unsatisfactory multiparty main station service from 38% to 21%. The progress made by the Company in this area is acknowledged, however we conclude that the Company must continue its remedial action in all areas. One necessary factor in obtaining better service in the franchised areas here involved is more abundant and improved equipment. The Commission has two courses of pursuit, it may either ignore the duty imposed upon it by statute to grant a fair rate of return and thereby starve the Company making it impossible for it to improve service, or it can take the approach, which we here adopt, for improved service by fixing just and reasonable rates under our statutory formula. We conclude that it is appropriate to approve fair rates which should be a necessary and integral part of the eventual solution of the service problems, when joined with ap-

propriate remedial action carried out with deliberate dispatch by the Company."

Appellant contends that the Commission is precluded as a matter of law from granting any increase in rates to a utility whose services are determined to be substandard. Lee, on the other hand, argues that the Commission has no authority to consider quality of service in determining fair and just rates and must grant an increase, otherwise found just and reasonable, without taking into consideration the substandard quality of service being provided by the utility. We disagree with both contentions.

[2]     After setting forth the various considerations to be made by the Commission in fixing rates, G.S. 62-133 provides in subsection (d) that "[t]he Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates." It is our opinion that this provision authorizes the Commission to consider quality of service as a factor in determining what constitutes just and reasonable rates to be charged by a utility.

It stands to reason that if a utility fails to provide adequate service on account of inefficient management, rates should not be permitted which would require the customer to pay for this inefficiency. The market place regulates the price paid for the service or product of an ordinary business. If the product or service offered is inferior, the customer has the option of purchasing from a competitor who, through efficiency, provides the better product or service. This is not true in the case of a utility which by nature is monopolistic. The price which a customer pays and a utility charges must necessarily be established by an agency charged with the responsibility of fixing rates that are just and reasonable to the public and to the company. To say, as Lee insists, that the quality of service is never to be considered in fixing rates would be to say that the shareholders of a utility are entitled to economic advantages that are never available to the owners of businesses which compete freely in the market place.

The principle that permits the consideration of quality of service in fixing rates is not without supporting authority. See for instance *Kennebec Water District v. Waterville,* 97 Me. 185, 54 A. 6; *United Telephone Company of Florida v. Mayo,* 215 So. 2d 609 (Fla. 1968), appeal dismissed, 394 U.S. 995, 22 L. Ed. 2d 774, 89 S. Ct. 1589 (a Florida statute expressly authorizes the consideration of the quality of service in fixing rates); *Re Middle States Utilities Company,* 72 P.U.R. (n.s.) 17; *Ward v. Limestone Water & Sewer Co.,* 17 P.U.R. (n.s.) 117.

On the other hand, to hold as appellant urges, that the Commission is required as a matter of law to refuse a reasonable rate increase upon a finding of substandard service could lead to strained results. Various reasons may exist for substandard service, including the inability of a utility to attract expansion capital on account of inadequate rates. In *Telephone Co. v. P.U.C.*, 158 Ohio St. 441, 110 N.E. 2d 59, the Ohio Supreme Court considered a case where the Utility Commission of that State had denied a telephone rate increase until certain improvements in service were made. The proposed increase had been found just and reasonable by the Commission. In reversing the Commission the Ohio Supreme Court stated as follows:

"A utility to survive must receive a fair return on its property. Otherwise capital will not be attracted to furnish the funds for the new equipment needed to meet the demands of increased population and the consequential necessity for increased service. The commission's order as made has the effect of creating serious difficulties for the company. A situation is present where the company needs an increase in rates to attract capital to buy new equipment and to meet increased demands, and the commission says, in effect, 'we will give you the new rates to attract the new capital to purchase new equipment when you show that you have installed the new equipment'. Adoption of such an attitude would hamstring the utility.

A public utility commission may not so act as to confiscate the property of a utility, and where it is determined that adequate rates do not exist, an order granting an increase but suspending the same until such time as certain facilities and improvements are provided does have that effect."

Appellant further argues that if the Commission does have authority to grant reasonable rate increases where there is substandard service, the Commission nevertheless committed error in this case by failing to give sufficient weight to its findings regarding the substandard service of Lee and in failing to conclude that a fair rate of return for Lee should be substantially less than that for a company furnishing more adequate service. No suggestion is made as to what the rate of return should be or as to how much weight should be given to the factor of inferior service. It is elementary that such factors as giving weight and credit to the evidence are outside the province of an appellate court. See *Utilities Commission v. Telephone Co.*, 266 N.C. 450, 146 S.E. 2d 487.

[3]  It is the prerogative of the Commission, and not this court, to

decide the question as to what constitutes fair and reasonable rates that may be charged by a utility. " 'It is an agency composed of men of special knowledge, observation, and experience in their field, and it has at hand a staff trained for this type of work. And the law imposes upon it, not us, the duty to fix the rates.' " *Utilities Commission v. Champion Papers, Inc.,* 259 N.C. 449, 456, 130 S.E. 2d 890, quoting from *Utilities Com. v. State and Utilities Com. v. Telegraph Co.,* 239 N.C. 333, 80 S.E. 2d 133.

[1]    It is clear from the order that the Commission considered and gave weight to the substandard quality of the service being furnished by Lee. It refused, however, to withhold any rate increase as a means of forcing better service. This action was not improper. Chapter 62 of the General Statutes authorizes the imposition by the Commission of numerous sanctions and penalties in order to enforce its rules and orders. It therefore does not follow that in refusing to withhold its approval of *any* rate increase, the Commission surrendered its only means of requiring Lee to provide its customers with adequate service. Indeed, the Commission in its order directed Lee to take comprehensive and specific steps to upgrade its service to acceptable standards. There is nothing in the record to suggest that the Commission will neglect to enforce these provisions of its order.

[4]    Appellant's third contention is that the test period used by the Commission was not representative. The test period used was the twelve months ending 31 May 1968. The argument of the appellant is that more substantial investments were made in plant and equipment during this twelve-month period than in any of the preceding twelve-month periods. G.S. 62-133(c) provides:

> "The public utility's property and its fair value shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time."

[5]    The value of plant and service must be determined as of a specific date — the end of the test period — and not by averaging a group of periods or months within a period. This principle, which is clearly provided by the statute quoted above, was applied in *Utilities Commission v. Gas Co.,* 254 N.C. 536, 119 S.E. 2d 469, where one of the grounds for the reversal of a Commission order was that the Commission had erroneously determined the utility rate base by averaging the net investment for the year. It was there stated:

> "Since rates are prospective, the base should have been determined as of the date the rates became effective. Piedmont is a rapidly growing company. Its investment was greatest at the

end of the test year. Hence the investment at that time should be accepted rather than the average for the year."

We hold that the Commission correctly determined the investment base as of the end of the test period.

[6]  For his fourth contention appellant asserts that Lee's telephone plant under construction but not in operation should have been excluded from the rate base.

In finding of fact No. 6 the Commission found the net book investment rate in the amount calculated by its staff. In the exhibit reflecting this calculation it appears that $318,052 was included for "telephone plant under construction."

In *Utilities Commission v. Telephone Co.*, 263 N.C. 702, 140 S.E. 2d 319, the Commission found the fair value of the Lee Telephone Company property in North Carolina used and useful in rendering service and producing revenue to be $2,100,000 and denied an application for increased rates. The Supreme Court held this finding to be unsupported by competent, material and substantial evidence which was set forth in part as follows:

"The Company, according to the Commission, did not use average net investment. It determined North Carolina net investment as of the end of the period, including allowance for cash working capital and after accounting and *pro forma* adjustments, which includes $84,124.00 of Virginia property allocated to North Carolina and giving effect to interest which was capitalized *on plant under construction at $2,112,810.00*. The Company offered evidence to the effect that the fair value of the North Carolina property was at least $2,250,000.00.

\*        \*        \*

Using $410.00 as replacement cost of the Company's 7,610 stations in North Carolina, the current cost of the Company's North Carolina plant would be $3,120,100.00, less depreciation of 28.94% heretofore taken, amounting to a deduction or reserve of $902,957.00, leaving the cost of the North Carolina plant, less depreciation, at $2,217,143.00. *When the additional cost of plant under construction is added* thereto, plus the allocated portion of the properties in Virginia chargeable to the North Carolina operation, the total current cost, according to the Company's evidence, on all properties used and useful in rendering service in North Carolina, is $2,354,174.00." (Emphasis added).

[7]  While the propriety of including the cost of plant under con-

struction in the rate base was not directly before the court in the above cited case, we cannot overlook the fact that the inclusion of such evidence for consideration by the Commission was approved, at least by implication. It is the duty of the Commission to arrive at an independent rate base upon consideration of all factors, including cost, replacement and trended cost and it is its duty to exercise its independent judgment in doing so. *Utilities Com. v. State and Utilities Com. v. Telegraph Co., supra.*

[6] Furthermore, it affirmatively appears that in the exhibit forming the basis for the Commission's finding as to the rate base, interest during construction was added to Lee's operating income thus reducing the amount of revenue found to be required by the company. This same type of accounting procedure was followed by other witnesses offering evidence. This practice appears to be generally accepted in rate-making cases. The reason for this is set forth in 1 Priest, Principles of Public Utility Regulation (1969), p. 178, wherein it is stated as follows:

> "Utility property does not spring into miraculous existence when it is needed, but must be constructed over substantial periods of time. Payments for work done are made as that work progresses, but the property under construction cannot begin to earn a return until it is actually in service. The cost of capital required in the construction period is just as actual as expenditures for labor. And provision for that cost has characterictically been made by charging interest to utility plant in the course of its construction.
>
> Under most accounting systems, a bookkeeping entry must be made crediting to the utility's income account, as if it were actual income, the entire amount of interest during construction which is capitalized. The effect of that bookkeeping entry is to offset the charge made to plant account, increasing the company's income for rate-making purposes and therefore limiting the amount of any permissible upward revision of rates."

The procedure followed by the Commission in including "plant under construction" in the rate base while crediting "interest during construction" to Lee's operating income is in accordance with generally accepted practices and does not constitute error.

[8] The next contention made by appellant is that the Commission should have made specific findings with respect to profits earned by an affiliated but unregulated company.

Lee is owned by Central Telephone and Utilities Corporation

(C.T.U.). C.T.U. also controls other telephone operating properties through its controlling interest in various companies comprising the Central Telephone System. In 1967 C.T.U. organized Centel Service Company (Centel) for the purpose of providing the telephone operating companies in the Central Telephone System, including Lee, with a source of supply for materials. Lee urges that the advantage of a service company such as Centel is that operating companies can have material orders immediately filled from the warehouse of the service company. Consequently, the operating companies do not have to maintain as large an inventory as they otherwise would. The operating companies are not bound to purchase solely from Centel and remain free to make purchases from whatever source they see fit. The record does not disclose the extent to which Lee exercises this freedom, but it does show that in 1968 Centel made sales to Lee's North Carolina division in the amount of $542,751. Net profit attributable to those sales was $39,621. This represents a ratio of 7.3% of net profit to sales. The Commission made the following conclusion with respect to Centel:

"14.    The level of profitability of the Centel Service Company on its purchasing and distribution of materials and supplies for its affiliate Lee Telephone Company requires that the Commission take notice of this type of relationship. Such transactions must be consummated within a true arms length environment if their results are to be accepted without adjustment or in-depth scrutiny. The Commission cannot permit parent holding companies to use affiliate companies as a device for transmitting an unreasonable level of profits to such parent holding company from goods or services supplied the operating company by way of an affiliate company (G.S. 62-153). It is the duty of the operating telephone company to prove that the prices it has paid for goods and services received from an affiliate are no greater than would have been paid through true arms-length bargaining, and in fact lower prices should necessarily be the result. In the instant proceeding, the reasonableness of the level of prices charged and paid was not clearly demonstrated and no in-depth study was made by the Commission Staff due to the fact that Centel Service Company had been in operation approximately one year at the time of the hearing. No adjustment is being made to the rate base or in the operating expenses due to these inter-company transactions, and the Commission is not approving or disapproving the level of profitability of the transactions between these two affiliates. We conclude it to be appropriate for this Commission to reserve for future consider-

ation any need for investigation and possible adjustments which may properly arise therefrom in connection with inter-affiliated company transactions."

**[8, 9]**  It appears from the above conclusion that the Commission is well aware of the principles that must govern the relationship between utility operating companies and affiliated supply companies. It is the duty of the regulatory Commission to look closely at transactions between such companies to be sure that the public is not required to pay rates based on excessive costs resulting from excessive profits earned by an unregulated supplier. *Pacific Telephone & Tel. Co. v. Public Utilities Com'n.*, 44 Cal. Rptr. 1, 401 P. 2d 353; *Columbus v. P.U.C.*, 154 Ohio St. 107; 93 N.E. 2d 693. However, the Commission has reserved this phase of the rate inquiry for future consideration and investigation and we must assume that in doing so it has not closed the book on the question of the reasonableness of the profits earned by Centel on material supplied to Lee. In view of the short period of operation of Centel, we conclude that the Commission was acting within its discretion in delaying a determination of this question.

**[10]**  The sixth contention presented by appellant is that the Commission erred in failing to credit to Lee's working capital requirements amounts paid by customers in advance of services rendered.

Cash working capital is one of the ingredients in the net book investment rate base established by the Commission. Lee bills customers at the first of the month for the base rate for that month's service. The contention is made that Lee has the use of funds paid by customers in response to these advance billings. There is no evidence in the record to show at what point during the month the average bill is paid. Appellant argues that it should be assumed that, on the average, customers pay by the middle of the month. If we accept this assumption the fallacy of appellant's argument becomes readily apparent, for by the middle of the month half of the service has been performed and the costs of that service have been incurred without compensation therefor. The equities in such a situation tend to become balanced. We also note that toll charges are always made sometime *after* the service is rendered. Conceding *arguendo* that the Commission could have considered advance payments actually received as available for working capital, it is our opinion that it was not required as a matter of law to do so. See *Columbus v. P.U.C., supra; In Re Diamond State Telephone Co.*, 51 Del. 525, 149 A. 2d 324.

**[11]**  For his tenth contention appellant insists that the Commission was under a duty to make findings as to whether or not the

present rate of return to Lee was insufficient to attract the necessary capital from investors in order to finance needed expansion and improvement of Lee's plant and equipment. The finding that the new rate represented a fair rate of return on the fair value of the company's utility property was tantamount to a finding that the existing rates were inadequate. The assignment of error which is the basis of this contention is overruled.

[12]   We have not overlooked the eighth and ninth contentions which are argued in appellant's brief. Under these two contentions, appellant has collected twenty-five exceptions made to the Commission's findings and conclusions. The exceptions challenge virtually all of the essential findings and conclusions made by the Commission and border on being broadside. We admit to difficulty in ferreting out the arguments made regarding some of these exceptions. Many of the arguments are repetitious, having also been made under contentions set forth previously in appellant's brief. At least one of the exceptions is expressly abandoned. Others are deemed abandoned because no argument or citation of authority is brought forward in their support. Rule 28, Rules of Practice in the North Carolina Court of Appeals. Suffice to say we have considered the entire order of the Commission and find substantial evidence in the record to support each finding made and the findings support the conclusions and the order.

Affirmed.

Brock and Britt, JJ., concur.