242 S.E.2d 862 (1978)
STATE of North Carolina ex rel. UTILITIES COMMISSION and Piedmont Natural Gas Company, Inc.
v.
Rufus L. EDMISTEN, Attorney General.
STATE of North Carolina ex rel. UTILITIES COMMISSION and Public Service Company of North Carolina, Inc.
v.
Rufus L. EDMISTEN, Attorney General.
STATE of North Carolina ex rel. UTILITIES COMMISSION and North Carolina Natural Gas Corporation
v.
Rufus L. EDMISTEN, Attorney General.
No. 60.
Supreme Court of North Carolina.
April 17, 1978.
*865 Atty. Gen. Rufus L. Edmisten by Sp. Deputy Atty. Gen. Robert P. Gruber and Asst. Atty. Gen. Jesse C. Brake, Raleigh, for intervenor-appellant.
Commission Atty. Edward B. Hipp and Associate Commission Atty. Antoinette R. Wike, Raleigh, for appellee, North Carolina Utilities Commission.
Brooks, Pierce, McLendon, Humphrey & Leonard by Jerry W. Amos and James T. Williams, Jr., Greensboro, for Piedmont Natural Gas Company, Inc., appellee.
Boyce, Mitchell, Burns & Smith by F. Kent Burns and James M. Day, Raleigh, for Public Service Company of North Carolina, Inc., appellee.
McCoy, Weaver, Wiggins, Cleveland & Raper by Donald W. McCoy, Fayetteville, for North Carolina Natural Gas Corporation, appellee.
COPELAND, Justice.
The appellees initially contend that, because no appeal was taken from the Commission order establishing Rule R1-17(h), the Attorney General is bound by the principles of res judicata and may not now challenge the validity of that rule. For reasons which follow, we have determined that this contention is not well taken; thus, we have considered the Attorney General's arguments concerning the authority of the Commission to permit utilities to recover excess costs of exploration ventures through a tracking rate. It is our conclusion that these actions were within the power of the Commission; therefore, the decision of the Court of Appeals must be affirmed.
We first examine the appellees' contention that the Attorney General's failure to appeal the Commission order promulgating Rule R1-17(h) should foreclose any review of the lawfulness of the procedure approved in that order. We have earlier held that, "Only specific questions actually heard and finally determined by the Commission in its judicial character are res judicata, and then only as to the parties to the hearing." Utilities Commission v. Area Development, Inc., 257 N.C. 560, 570, 126 S.E.2d 325, 333 (1962) (emphasis added). It is argued that the actions of the Commission here were adjudicatory because G.S. 62-60 provides that, "For the purpose of conducting hearings, making decisions and issuing orders, and in formal investigations where a record is made of testimony under oath, the Commission shall be deemed to exercise functions judicial in nature and shall have all the powers and jurisdiction of *866 a court of general jurisdiction as to all subjects over which the Commission has or may hereafter be given jurisdiction by law."
G.S. 62-23, however, states that, "In proceedings in which the Commission is exercising functions judicial in nature, it shall act in a judicial capacity as provided in G.S. 62-60. The Commission shall separate its administrative or executive functions, its rule making functions, and its functions judicial in nature to such extent as it deems practical and advisable in the public interest." The proceeding which led to the issuance of Rule R1-17(h) was denominated by the Commission at the outset to be a rule making investigation. Indeed, the effect of the order was the promulgation of a rule of general application to all natural gas utilities subject to the jurisdiction of the Commission. The rate making activities of the Commission are a legislative function. Utilities Commission v. General Telephone Company, 281 N.C. 318, 189 S.E.2d 705 (1972). Rule making is likewise an exercise of the delegated legislative authority of the Commission, under G.S. 62-30 and G.S. 62-31, to supervise and control the public utilities of this State and to make reasonable rules and regulations to accomplish that end. Actions of an administrative agency which involve the exercise of a legislative rather than a judicial function are not res judicata. 73 C.J.S. Public Utilities § 59, pp. 1138-1139. Exercises of the Commission's rule making power, therefore, are not governed by the principles of res judicata and are reviewable by this court in later appeals of closely related matters. See also, 2 K. Davis, Administrative Law Treatise, § 18.08 (1958).
The Attorney General argues that, in approving these rate surcharges to fund gas exploration and drilling ventures, the Utilities Commission exceeded its statutory authority by permitting the utility companies to obtain forced investment capital from their ratepayers under the guise of recovering operating expenses. It is his assertion that the costs of these programs properly should have been borne by financing out of retained earnings or other methods and recouped through the rate base in a general rate making proceeding.
This contention in substance attacks the validity of Rule R1-17(h), in which the Commission established procedures for participation by natural gas utilities in exploration and drilling programs and for applications for rate changes to recover costs and account for revenues associated with such programs. The rule directs the formation of a committee composed of representatives from the gas utilities, the Commission, and the utilities' wholesale municipal customers. This committee's function is to select exploration projects for presentation to the Commission for approval. Following such approval, the projects may be implemented by the utilities.
The rule further provides that:
"(6) On or before June 1 of each year, each natural gas utility shall file with this Commission a statement of all reasonable costs incurred and revenues received from Commission-approved exploration programs during the six months period ended the preceding March 31. On or before December 1 of each year, each natural gas utility shall file with this Commission a similar statement for the six months period ended the preceding September 30."
A utility may recover the costs of its Commission-approved projects for the previous six months reporting period by filing for an increase in its rates through a tracking charge. Such increases are limited, however, to the amount by which reasonable costs of the programs exceed revenues received from them. In the event revenues received should exceed reasonable costs, the utility must file to adjust its rates downward by an amount sufficient to amortize these excess revenues over the following six months period.
The Commission stated in its order issuing this rule, as well as in the rule itself, that, under the existing circumstances, exploration and development costs of new gas supply sources were ordinary and reasonable operating expenses of public utility gas distribution companies.
*867 The Attorney General asserts that this rule contemplates a procedure which, in substance, merely collects risk capital from consumers and thereby shifts the enterprise risks of gas exploration from willing investors over to a captive consuming public. He strongly argues that this violates the basic tenets of free enterprise and assigns to the operating expense element of the rate making formula in G.S. 62-133 a function which it was not intended to bear, that of attraction of capital. We have earlier noted in a different context, however, that because a public utility is a legally regulated monopoly, "[M]any of the basic principles of the Free Enterprise System, which govern the operations of and the charges by industrial and commercial corporations and those of the corner grocery store, have no application to the regulation of the service or charges of a utility company." Utilities Commission v. General Telephone Company, supra, 281 N.C. at 335, 189 S.E.2d, at 716-717.
At the time of the promulgation of Rule R1-17(h), it was the declared policy of the State of North Carolina in G.S. 62-2 of the Public Utilities Act to, among other things, ". . . promote adequate, economical and efficient utility services to all of the citizens and residents of the State." Since the issuance of this rule, and prior to the approval of the rate increases challenged here, G.S. 62-2 was amended to recognize that the availability of adequate and reliable supplies of electricity and natural gas are a matter of State public policy. G.S. 62-131(b) requires every public utility to render adequate, efficient and reasonable service. In addition, under G.S. 62-32 and G.S. 62-42, the Utilities Commission is given the power and the duty to compel utility companies to render adequate service and to set reasonable rates for such service. Utilities Commission v. Morgan, 277 N.C. 255, 177 S.E.2d 405 (1970), aff'd on rehearing, 278 N.C. 235, 179 S.E.2d 419 (1971).
Following hearings on the proposed rule making, the Commission found as fact that: (1) an emergency gas shortage existed in North Carolina; (2) unless North Carolina gas utilities were able to obtain additional gas supplies, they would be unable to render adequate and efficient service to their customers; (3) without additional gas supplies, many industries in North Carolina would be unable to continue operations, resulting in layoffs and consequent losses of payrolls, production, sales and profits, which would produce adverse effects on the economy of the State; (4) unless additional gas supplies were found for North Carolina gas utilities, substantial increases in rates to gas customers in this State would be necessary in order to meet increases imposed by the utilities' sole pipeline supplier, as well as to cover the spreading of fixed costs over a smaller sales volume; (5) the most feasible method for increasing gas supplies to the State at lowest cost was through programs of exploration and development by each North Carolina gas utility; (6) the gas utilities were unable to fund exploration and drilling programs of sufficient size to obtain additional gas supplies for the State through traditional methods of debt and equity financing and retained earnings; and (7) prudent expenditures of funds for exploration purposes during periods of severe and deepening curtailment of pipeline supplies of gas were ordinary and reasonable operating expenses of intrastate natural gas distribution companies. Since the evidence on which these findings of fact were based was not brought forward in the record on appeal, they are deemed supported by competent, material and substantial evidence and are binding on this Court. Utilities Commission v. Woodstock Electric Membership Corporation, 276 N.C. 108, 171 S.E.2d 406 (1970).
In view of these findings of fact, we hold that the Commission, in ordering that the reasonable costs of approved exploration projects were to be recoverable through tracking rate increases, acted within its acknowledged duty and authority to compel adequate and efficient utility service to the citizens of this State. It is clear from the Commission's findings that, without additional gas supplies, the gas utilities would be unable to render adequate service to their customers, that exploration programs were the most feasible means for obtaining these additional supplies, and that *868 the utilities were unable, through traditional methods of financing, to fund sufficient exploration projects to obtain these supplies. Under these circumstances, the Commission was well within its authority in approving the exploration concept and including the excess costs in the price of gas to customers, since these expenses were incurred for their benefit and the excess profits, under the Commission's order, were preserved for the customers paying the rate increase.
Nonetheless, the Attorney General argues that the tracking rate was impermissible since the Commission erred in ordering that these costs were to be included as operating expenses. When a narrow construction of the operating expense element of a regulatory act would frustrate the purposes of the act, however, the term should be liberally interpreted and applied. Bourland v. City of Fort Smith, 190 Ark. 289, 78 S.W.2d 383 (1935). Moreover, the purpose of the Public Utilities Act is to put the policies enumerated in G.S. 62-2 into effect. Utilities Commission v. Morgan, supra. As was indicated earlier, one of the primary policies set out in G.S. 62-2 is to promote adequate utility services to all the citizens of the State and, more recently, to promote the availability of reliable supplies of natural gas. A restrictive interpretation here of the operating expense element of the rate making formula would severely limit the ability of the Commission to act in the best interest of the consuming public in emergency situations. We decline to interpret the meaning of operating expense so narrowly. According to the Commission's findings, if no new supply source were obtained, the utilities would be unable to supply adequate service to their customers and severe repercussions to the economy of the State would ensue. In such a situation, the costs of these projects, handled as outlined above, must be said to be operating expenses if practical effect is to be given the Act. See, Bourland v. City of Fort Smith, supra.
It is also worthy of note that, two days before the order issuing Rule R1-17(h) was handed down, the legislature enacted an amendment to G.S. 105-116 exempting exploration and drilling surcharges collected by North Carolina gas utilities from the franchise tax provided for in that section. While our holding is not based on this amendment, we do view it as indicative of the intended scope of the Commission's legislative authority in this area.
We have determined, therefore, that the acts of the Commission were within its statutory authority and the Attorney General's assignments of error to the contrary are overruled.
The Attorney General next assigns as error the failure of the Commission to declare the proceedings in which these rate increases for exploration costs were approved to be general rate cases under G.S. 62-133. Under Rule R1-17(h), the Commission may permit exploration tracking rate increases to become effective if, after reviewing the data required to be filed with a gas utility's semi-annual exploration program reports, it concludes that the requested rate increases will not result in increasing the applicant company's rate of return over the rate of return most recently approved for that company in a general rate case. These rate increases, as noted earlier, were initially approved by the Commission in orders issued in January, 1976. The Attorney General filed notice of appeal and exceptions to each of these three orders. In response to motions filed by the applicant companies pursuant to G.S. 62-90(c), the Commission set hearings on these exceptions for 16 March 1976. At these hearings the Commission, upon inquiry by the Attorney General, declared that the proceedings were not general rate cases. On 8 April 1976, supplemental orders were issued by the Commission affirming its earlier orders approving the rate increases.
G.S. 62-137 provides that:
"In setting a hearing on rates upon its own motion, upon complaint, or upon application of a public utility, the Commission shall declare the scope of the hearing by determining whether it is to be a general rate case, under G.S. 62-133, or whether it is to be a case confined to the reasonableness of a specific single rate, a *869 small part of the rate structure, or some classification of users involving questions which do not require a determination of the entire rate structure and overall rate of return."
Relying primarily on his characterization of the exploration costs as capital accumulation, the Attorney General asserts that the Commission erred in declaring that these proceedings were not general rate cases. He also contends that he was prejudiced here in that if the Commission had declared these proceedings to be general rate cases, he would have been entitled to the special procedure for hearings in general rate cases outlined in G.S. 62-81.
We have determined, however, that the Commission acted within its authority in finding expenditures for exploration and drilling programs to be operating expenses. Moreover, G.S. 62-90(c), pursuant to which these hearings were held, states, "The Commission may on motion of any party to the proceeding or on its own motion set the exceptions to the final order upon which such appeal is based for further hearings before the Commission." G.S. 62-137, therefore, is inapplicable to proceedings conducted under G.S. 62-90(c), since their scope is limited by statute to the exceptions on which the particular appeal of a final order or decision is based, leaving the Commission without authority to declare the hearings a general rate case or complaint proceeding. The Commission may consider only the grounds upon which the appellant asserts that the Commission's order or decision is unlawful, unjust, unreasonable or unwarranted, including alleged errors committed by the Commission. G.S. 62-90(a). Should the Commission determine that any of the exceptions are well-taken, it may set the case for further hearing under its authority in G.S. 62-80 to rescind, alter or amend its decisions or orders. See Utilities Commission and Nantahala Power and Light Co. v. Edmisten, 291 N.C. 575, 232 S.E.2d 177 (1977). At that time a declaration of the scope of the proceedings would be proper if, as here, the prior order had been issued without hearing, see, Utilities Commission and Carolina Power and Light Co. v. Edmisten, 291 N.C. 327, 230 S.E.2d 651 (1976) (outlining three methods by which rate increases may become effective without hearing), since this would be the first opportunity for a finding by the Commission, in setting hearings, as to whether the case involved questions requiring a determination of the entire rate structure and overall rate of return.
It is also maintained that the Commission's failure to conduct a hearing prior to approval and implementation of the rate increases invalidates the original rate orders. We have recently held, however, that, in addition to other methods, the Commission may by an affirmative order under G.S. 62-134(a) allow requested rate changes to go into effect, either conditionally or unconditionally, for good cause shown. Utilities Commission and Carolina Power and Light Co. v. Edmisten, supra.
In Rule R1-17(h), the Commission provided that it could allow an exploration tracking rate increase to go into effect on a finding that the requested increase would not raise the utility's rate of return above the level most recently approved for it in a general rate case. The Commission made such findings in these initial orders; therefore, good cause was shown to allow the rate increases to become effective.
In addition, rates which are merely permitted or allowed to go into effect without hearing are to be distinguished from those which are established after full hearing, findings, conclusions and formal order because the latter are deemed just and reasonable, "`. . . and any rate charged by any public utility different from those so established shall be deemed unjust and unreasonable.' G.S. 62-132. Rates which the Commission simply allows to go into effect by any of the three methods described are subject to being challenged by interested parties or the Commission itself and after a `hearing thereon, if the Commission shall find the rates or charges collected to be other than the rates established by the Commission, and to be unjust, unreasonable, discriminatory or preferential, the Commission may' order refund pursuant to the provisions of G.S. 62-132." Id., at 352, *870 230 S.E.2d, at 666. Such refund may be ordered even absent a utility's agreement to provide one. Id. The Attorney General, consequently, was in no way prejudiced by the action of the Commission in approving these rate increases without hearing and may not secure reversal on such grounds. G.S. 62-94(c). This assignment of error is without merit and overruled.
In his next assignment of error, the Attorney General argues that the actions of the Commission here violated Due Process and resulted in a denial of Equal Protection of the laws to the ratepaying public under the North Carolina and United States Constitutions. He initially contends that the orders here violated substantive Due Process under our Law of the Land Clause, N.C.Const. art. 1, § 19, and the federal Due Process Clause, U.S.Const. amend. XIV, § 1, in that they were an attempt to collect risk capital from the public to finance new private enterprises.
It has been clearly stated, however, that substantive Due Process will no longer be used in federal constitutional law to review the wisdom of state economic regulations. Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). Still, decisions of the United States Supreme Court construing the federal Due Process Clause, while persuasive, are not binding upon this Court in interpreting the North Carolina Constitution's Law of the Land Clause. Horton v. Gulledge, 277 N.C. 353, 177 S.E.2d 885 (1970).
Stimulation of the economy is an essential public and governmental purpose and the manner in which this purpose is to be accomplished is, within constitutional limits, exclusively a legislative decision. Mitchell v. North Carolina Industrial Development Financing Authority, 273 N.C. 137, 159 S.E.2d 745 (1968). The authority to set rates to be charged by a public utility for its services rests in the Legislature and is delegated by it to the Utilities Commission under sufficient rules and standards to guide the Commission in exercising this power. Utilities Commission v. State, 239 N.C. 333, 80 S.E.2d 133 (1954).
The Attorney General relies on our decision in Bulova Watch Company v. Brand Distributors of North Wilkesboro, Inc., 285 N.C. 467, 206 S.E.2d 141 (1974), to support his contention that the rate increases here were forced investments and thus violative of the ratepayers' freedom of contract. In that case we acknowledged that we may not declare a statute unconstitutional merely because we deem it economically unwise; however, we stated that where an individual's freedom of contract is infringed by a statute, it must be declared invalid unless the law's benefit to the public outweighs the infringement. We further determined there that protection of producers of trademarked articles against price-cutting or unfair use of the trademark were insufficient benefits to offset the substantial infringement the non-signer clause of the North Carolina Fair Trade Act imposed.
We hold here, however, that the severe adverse economic effects sought to be avoided by approval and funding of these exploration projects present a sufficient public concern to outweigh the infringement, if any there be, arising from the rate increases ordered by the Commission. This argument, therefore, is without merit.
Regarding his Equal Protection claim, the Attorney General contends that the rates approved here were determined arbitrarily and capriciously, in that no attempt was made to determine which customers would benefit from the programs or were responsible for the gas shortage and, further, that discrimination might arise between present ratepayers who were providing the funds and future ratepayers who might be unjustly enriched. We have earlier noted, however, that rate making is not an exact process. Utilities Commission v. Morgan, 278 N.C. 235, 179 S.E.2d 419 (1971). Moreover, state economic regulatory classifications need bear only a rational relationship to a legitimate governmental objective in order to withstand an equal protection challenge. New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); Duggins v. North Carolina State Board of *871 Certified Public Accountant Examiners, 294 N.C. 120, 240 S.E.2d 406 (1978).
It was certainly within the authority of the Commission to determine that all North Carolina gas ratepayers would benefit from increased supplies of natural gas, both through assured availability and improvement in the State's economy. While finer distinctions arguably could have been drawn in terms of breaking down the rate schedules so as to match likely rewards from the programs to specific classes of ratepayers, a State is not required to solve all aspects of an economic dilemma at once and may proceed one step at a time to overcome such problems. Williamson v. Lee Optical, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). In addition, the Commission provided in subsection (7) of Rule R1-17(h) that funds received from rate increases for exploration expenses are to be kept segregated on the utilities' books and the beneficial interest in any gas discovered or profits generated through exploration activities funded by such increases are to be preserved for customers paying such increases. Thus, any discrimination between present and future ratepayers would appear to have been avoided, since any rewards accruing from these increases must be preserved for the customers actually supplying the funds.
The Attorney General also maintains that procedural Due Process was denied the ratepaying public here in that allegedly insufficient notice was provided the public before these rate increases were put into effect. As we noted earlier, however, these rate increases were not rates made, fixed or established by the Commission, since no rate hearing was held prior to their being put into effect; thus, any interested party may challenge these rates and, even absent a utility's undertaking to do so, obtain a refund should the Commission find the increases to be erroneous. Utilities Commission and Carolina Power and Light Co. v. Edmisten, supra. Any Due Process rights which interested parties may have are fully protected by this procedure. Id. This assignment of error, therefore, is overruled in its entirety.
We have reviewed the Attorney General's remaining assignments of error and find them to be without merit; thus, they are overruled. For the reasons given, we have determined that the actions of the Utilities Commission here were within its statutory authority, free of procedural error and violative of no constitutional provisions; therefore, the decision of the Court of Appeals affirming the orders of the Commission is
AFFIRMED.
LAKE, Justice, dissenting.
Commissioner Purrington, the only dissenting member of the Utilities Commission, summarized rather well my own view of this matter, saying:
"Investment in exploration for natural gas by a gas distribution company is no different from investment in a coal mine by an electric utility except that the risks in the former investment are many times greater. Both investments can be advantageous to the Company in carrying out its utility function, but neither are utility functions (sic). Therefore, the cost of neither should be treated as a utility expense. For in so doing (and thereby passing through the cost thereof to the consumer in his rate), the source of capital funds is shifted from the investor to the consumer.
"In a free enterprise economy, investment decisions must be voluntary rather than imposed by regulatory authority. In my view, both the prior order in this docket and this further order require the consumer to become an involuntary investor in one of the most speculative enterprises known. * * * The company should bear the burden alone of raising investment capital."
As Chief Justice Barnhill, speaking for a unanimous Court, said in Utilities Commission v. Motor Lines, 240 N.C. 166, 81 S.E.2d 404 (1954): "The Utilities Commission is a creature of the Legislature. It may exercise only such authority as is vested in it by statute. And such authority must be exercised by it in accord with the standards prescribed by law." This elementary principle *872 of law has been repeatedly recognized and applied by this Court. Utilities Commission v. Merchandising Corp., 288 N.C. 715, 220 S.E.2d 304 (1975); Utilities Commission v. Telephone Co., 281 N.C. 318, 336, 189 S.E.2d 705 (1972); Utilities Commission v. R. R., 268 N.C. 242, 245, 150 S.E.2d 386 (1966); Utilities Commission v. Finishing Plant, 264 N.C. 416, 420, 142 S.E.2d 8 (1965); Utilities Commission v. Greyhound Corp., 224 N.C. 293, 29 S.E.2d 909 (1944).
Before reaching the merits of the Attorney General's appeal, two preliminary contentions of the appellees should be set at rest. The first is that this appeal is too late, the contention being that the Attorney General should have appealed when the Commission entered its order promulgating its Rule R1-17(h) establishing procedures to be followed in raising rates to recover gas exploration costs. The answer is such order was not then appealable. "[N]o appeal may be taken from an order by which the Commission adopts and promulgates a general regulatory rule of supervisory nature." Utilities Commission v. Greyhound Corp., supra. Not until rates for gas service were actually changed pursuant to this rule was there an appealable order. Thus, the present appeal is timely.
The second of these contentions is that no rate-payer appeared before the Commission in opposition to the adoption of Rule R1-17(h), or in opposition to the increase in gas rates presently in controversy and, on the contrary, the Textile Manufacturers Association and the Brick Manufacturers Association appeared before the Commission and expressed their approval of the proposed surcharge to raise funds for gas exploration. Obviously, if these groups of manufacturers, who are so vitally affected by a gas shortage, desire to contribute to the cost of a gas exploration venture, there is nothing which prevents their doing so, but their willingness to make such contributions cannot justify an order by the Commission requiring residential users and operators of small businesses to make proportionate contributions. It is equally obvious that the failure of these small consumers of gas to appear before the Commission does not support the appellees' inference that they do not object to the increase. We may, and should, take judicial notice of the well known fact that it is exceedingly expensive to employ adequate counsel and qualified expert witnesses to contest a utility's application for a rate increase. The oft-repeated cry of utility companies, "No one but the Attorney General appeared in opposition to the proposed rate," ignores the stark fact of economic life that a consumer, whose rate the utility proposes to raise by a relatively small sum per month, cannot afford to contest the lawfulness of the exaction before the Commission and in the appellate courts. That is why there were no consumers before the Commission protesting this rate increase. That is why the Legislature has authorized the Attorney General to appear in behalf of the consumers. G.S. 62-20. The thinly veiled suggestion that the Attorney General is an officious intermeddler in such matters is unworthy of serious consideration or extended discussion.
A third preliminary point, which was, in my view, given unjustified importance by the Court of Appeals, is the fact that on 26 June 1975, two days before the Utilities Commission issued its order promulgating Rule R1-17(h), the Legislature amended G.S. 105-116(c) to add thereto a proviso.
Chapter 105 of the General Statutes is the Revenue Act. It does not relate to public utilities except insofar as it affects them as taxpayers. It has no obvious relation to the regulatory or rate-making powers of the Utilities Commission, these being dealt with in Chapter 62 of the General Statutes. G.S. 105-116 imposes a "[f]ranchise or privilege tax on electric light, power, gas, water, sewerage, and other similar public service companies not otherwise taxed." This tax, computed pursuant to a somewhat complex formula, set forth in the statute, is, roughly, six per cent of the gross receipts derived by the utility from its business within this State. The amendment of 1975 added this proviso to this tax statute:
"[P]rovided further, that said tax shall not be applicable to special charges collected within this State by natural gas utilities pursuant to drilling and exploration *873 surcharges approved by the Utilities Commission, where such surcharges are segregated from the other receipts of the natural gas utility and are devoted to drilling, exploration and other means to acquire additional supplies of natural gas for the account of natural gas customers in North Carolina and where the beneficial interest in said surcharge collections is preserved for the natural gas customers paying said surcharges under rules established by the Utilities Commission."
The General Assembly adjourned two days later. Session Laws 1975, p. 1544.
Obviously, there is a logical basis for exempting from the operation of a franchise tax, measured by a company's gross receipts from its regular business in this State, which receipts are available for use for its general corporate purposes, revenues collected by it for the financing of explorations elsewhere, especially when those revenues are, by order of the Utilities Commission, specifically earmarked for use only in such exploration and, therefore, are received and held by the company as a trust fund for that purpose. To read into such a legislative exemption from such taxation, a legislative intent to grant to the Utilities Commission a wholly new power, never before asserted by it or supposed to reside in it, and so to amend an entirely different chapter of the General Statutes, as did the Court of Appeals, appears to me completely unrealistic and unwarranted. G.S. Chapter 105, the Revenue Act, and G.S. Chapter 62, the Public Utilities Law, are completely unrelated legislative programs. They are not in pari materia.
Such an obscure and circuitous approach by the Legislature, if it were intent upon enlarging the regulatory and rate-making powers of the Utilities Commission, the Legislature's own creature, seems most unlikely since all that would be needed for that purpose would be a direct and simple amendment to G.S. 62-133, which is the statute prescribing the procedure for fixing a utility company's rates, or the equally direct and simple addition of a new section to G.S. Chapter 62, Article 3, which is the portion of the chapter specifying the powers conferred upon the Utilities Commission. A far more plausible explanation of this enactment, passed in the haste of the closing days of the legislative session, is that the Legislature had no other purpose than that which plainly appears upon the face of the billto exempt such revenues from the reach of the franchise tax. This 1975 amendment to the Revenue Act appears to me, therefore, to shed no light whatever upon the question before us.
These facts plainly appear:
1. The distribution of natural gas for sale to consumers thereof is one business; the production of such gas is another; prospecting, or exploring, for such gas is still another.
2. These North Carolina utility companies have heretofore been engaged in the first such business only, not in the second or the third. They have never held themselves out to the public as being engaged in the business of production of natural gas or in the business of prospecting therefor. They hold no certificate of convenience and necessity for either production of or prospecting for natural gas.
3. These North Carolina utility companies have had, and now have, no duty whatsoever to the public to produce natural gas or to prospect therefor. They have not been ordered by the Utilities Commission to engage in either of those businesses, but only permitted by the Commission to do so within limits approved by the Commission. They require no such permission so long as they engage in such business activities, directly or through subsidiaries, with capital supplied by their stockholders, provided they do not jeopardize their public service undertakings to the North Carolina public.
4. What they have been granted by the Commission is not permission to invest their own money in this new business of prospecting for deposits or fields from which natural gas can be produced. What they have been granted by the Commission is permission to extract from North Carolina consumers of natural gas, purchased by these companies from other sources, over and above a fair rate for such purchased gas, new, additional capital with which to *874 embark upon this new business of prospecting for now undiscovered gas fields or deposits.
5. The proposed prospecting will not be done in North Carolina for there is no presently known reason to suppose there are such undiscovered sources of natural gas in this State.
6. Due to the rapid expansion of the use of natural gas in industrial plants, there is presently a critical shortage of such gas in this State and elsewhere.
7. The companies' motivation in turning into this new businessprospecting for natural gas depositsis not philanthropic, nor is it concern for the comfort and welfare of consumers of gas per se. Their motivation is certainly not reprehensible, but it keeps the issue sharply defined to label it correctlyself-interest. Each company has many millions of dollars invested in its present planta distribution system. If its supply of gas dwindles and sputters out, the company will become bankrupt. It is just as simple as that! The companies fear this may happen, so they want to venture into the wholly new business of prospecting for a new source of gas.
8. The companies' managements, seeing this ominous prospect, have gone to the companies' present ownerstheir stockholders and bondholdershave shown them the prospect and have, in effect, said to them: "To save your own present investment, we must have a further investment of new capital with which to prospect for new gas fields. Let us have this new capital in return for new bonds, or new stock, issued by the company, or its new subsidiary." But the existing bondholders and stockholders, represented in such matters by experienced experts, have said, in effect: "Oh, no! We invest in safe ventures, not in wildcat prospecting schemes. Don't look to us for capital with which to grubstake such a risky venture as that!"
9. Unable to get any prospecting capital from the "informed" sources, the companies have turned to the Utilities Commission and have said, in effect: "Make the North Carolina householder, merchant and manufacturer supply us with prospecting capital. We shall extract just a little each month from each consumer and then no one will have enough at stake to enable him to afford the cost of fighting the exaction." The Commission has replied, in effect: "Quite so! This is clearly best for the consumers of gas. We will compel the consumers of natural gas so to contribute the necessary capital by increasing the fair rates, otherwise paid by them, by a surcharge earmarked for prospecting. They will have to put up the capital for this venture, for otherwise you can cut off their gas service for nonpayment of their gas bills."
The difficulty is that the Commission has not been given authority so to conscript capital from unwilling investors, even if it be true that such a prospecting venture is for the best interests of the consumers of natural gas in North Carolina. The Commission does not have authority to do whatever it believes to be in the best interests of the public, not even if this Court agrees with that evaluation of the proposal. We need not presently inquire into whether the Legislature could, constitutionally, authorize the Commission so to conscript capital for a venture found by the Commission to be in the public interest and reasonably likely to succeed. Presently, it is a sufficient answer as to this question that the Legislature has not conferred upon the Utilities Commission authority to conscript from unwilling investors capital for such a prospecting business.
Prospecting for natural gas is not a public utility business. G.S. 62-3(23), par. a defines "public utility," as that term is used throughout G.S. Chapter 62. The term includes the businesses of owning or operating "in this State" facilities for "producing," "transmitting," "delivering or furnishing" piped gas to the public for compensation. The business of prospecting or exploring for deposits of natural gas is not one of these. "Neither the Commission nor this Court has authority to add to the types of business defined by the Legislature as public utilities." Utilities Commission v. Telegraph Co., 267 N.C. 257, 268, 148 S.E.2d 100, 109 (1966).
*875 G.S. 62-3(23), par. d expressly provides: "If any person conducting a public utility shall also conduct any enterprise not a public utility, such enterprise is not subject to the provisions of this Chapter." (Emphasis added.) G.S. 62-133, the statute which prescribes the procedure to be followed by the Utilities Commission in fixing rates to be charged for public utility service (i. e., the distribution of natural gas for consumption in this State), does not authorize the Commission to take into consideration expenditures by the utility company in its non-utility business (i. e., its business of prospecting for deposits of natural gas). In fixing rates for a "public utility" service, the Commission has heretofore consistently and properly excluded from consideration revenues derived from and expenses incurred in the company's non-utility businesses. The above cited statutes plainly so require.
In Utilities Commission v. Lee Telephone Co., 263 N.C. 702, 140 S.E.2d 319 (1965), this Court held that in fixing rates for public utility service in this State, the Utilities Commission may not take into consideration revenues received, expenses incurred or return derived by a public utility company from even its public utility business in another state. A fortiori in fixing rates for gas distributed in this State, the Commission may not take into account expenses incurred or revenues derived by the company from its non-utility, prospecting business conducted in another state. That is precisely what the Commission has done in authorizing these utilities to impose a surcharge upon the otherwise fair rates for gas distributed by them in North Carolina, which surcharge it computes on the basis of expenses incurred in their prospecting business in states other than North Carolina. For this further reason, the orders from which these appeals are taken were not within the authority of the Utilities Commission and the surcharge may not lawfully be collected, however laudable may have been the purpose of the Commission.
The several appellees cite G.S. 62-2, 30, 31, 32, 42(a), 130 and 131 as sources of the Commission's authority to conscript capital for prospecting from involuntary investors who consume gas purchased and distributed to them by the appellee utilities. These statutes do not support that position.
G.S. 62-2 is entitled, "Declaration of policy." It declares it to be the policy of this State to provide "fair regulation of public utilities," "[t]o promote the inherent advantage of regulated public utilities," "[t]o promote adequate * * * utility services," "[t]o provide just and reasonable rates * * for public utility services," "[t]o * * * promote harmony between public utilities, their users and the environment," "[t]o foster the continued service of public utilities," "[t]o seek to adjust the rate of growth of regulated energy supply facilities" and "[t]o cooperate with other states and with the federal government in promoting * * * public utility services and reliability of public utility energy supply." To those ends, it declares "authority shall be vested in the North Carolina Utilities Commission to regulate public utilities * * * in the manner and in accordance with the policies set forth in this Chapter." (Emphasis added throughout.) It then expressly states: "Nothing in this Chapter shall be construed to imply any extension of Utilities Commission regulatory jurisdiction over any industry or enterprise that is not subject to the regulatory jurisdiction of said Commission." (Emphasis added.) As above shown, the business of prospecting for deposits of natural gas in other states is an "enterprise" not subject to the regulatory jurisdiction of the Commission and is not a "public utility" as that term is used throughout G.S. Chapter 62, including this declaration of State policy. In this respect, there is no difference between G.S. 62-2 before and after the 1975 amendment thereof.
G.S. 62-30 provides:

"General powers of Commission.The Commission shall have and exercise such general power and authority to supervise and control the public utilities of the State as may be necessary to carry out the laws providing for their regulation, and all such other powers and duties as may be necessary or incident to the proper discharge of its duties." (Emphasis added except section title.)
G.S. 62-31 provides:

*876 "Power to make and enforce rules and regulations for public utilities.The Commission shall have and exercise full power and authority to administer and enforce the provisions of this Chapter, and to make and enforce reasonable and necessary rules and regulations to that end." (Emphasis added except section title.)
G.S. 62-32 provides:

"Supervisory powers; rates and services.(a) Under the rules herein prescribed and subject to the limitations hereinafter set forth, the Commission shall have general supervision over the rates charged and service rendered by all public utilities in this State." (Emphasis added except section title.)
"(b) The Commission is hereby vested with all power necessary to require and compel any public utility to provide and furnish to the citizens of this State reasonable service of the kind it undertakes to furnish and fix and regulate the reasonable rates and charges to be made for such service." (Emphasis added.)
As above noted, the business of prospecting for deposits of natural gas, especially in other states, is not a public utility business or service within the meaning of these sections of Chapter 62. Therefore, these provisions do not empower the Utilities Commission to conscript from unwilling investors (consumers of natural gas) capital with which to finance such prospecting.
G.S. 62-130 authorizes the Commission "[to] make, fix, establish or allow just and reasonable rates for all public utilities subject to its jurisdiction." (Emphasis added.) Obviously, rates fixed to supply to a prospecting business capital with which to operate its explorations in another state do not fall within the authority granted by this section. By hypothesis, the rates (exclusive of this surcharge) now charged users of gas purchased and distributed by these utility companies to the public in North Carolina are "just and reasonable." If not, the appropriate procedure for making them so is prescribed in G.S. 62-133.
G.S. 62-131 provides:

"Rates must be just and reasonable; service efficient.(a) Every rate made, demanded or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable.
"(b) Every public utility shall furnish adequate, efficient and reasonable service." (Emphasis added except section title.)
Clearly, this statute does not authorize the Commission to conscript capital from unwilling investors (i. e., consumers of gas) in order to finance a non-utility, prospecting venture in another state. We need not presently determine whether it authorizes the Commission to require a distributing gas company to invest its own funds in so hazardous a venture for the Commission has not required any of these utility companies to do that. They are authorized but not required so to invest their own funds. The question before us is, Does G.S. Chapter 62 authorize the Commission to conscript capital for such a venture from users of natural gas in North Carolina? In any opinion, it clearly does not.
G.S. 62-42(a), cited by Piedmont Natural Gas Company and by Public Service Company, simply authorizes the Commission upon its finding, after a hearing, that the service of a public utility is inadequate, to direct such utility to improve its service. Obviously, that statute does not authorize the Commission to conscript capital from the utility's customers for the purpose of financing the utility's prospecting ventures in another state.
The reliance by the appellees upon these statutory provisions as support for this unprecedented order of the Commission shows convincingly that there is no provision in G.S. Chapter 62 which confers the authority upon the Commission so to conscript capital for these non-utility, out-of-state ventures.
BRANCH and EXUM, JJ., join in this dissenting opinion.